

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-26-1996

# USA v. Molina-Guevara

Precedential or Non-Precedential:

Docket 94-5754

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

## Recommended Citation

"USA v. Molina-Guevara" (1996). *1996 Decisions*. Paper 81.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/81

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


NO. 94-5754


UNITED STATES OF AMERICA

v.

ARLEATHEA MOLINA GUEVARA


Arleathea Molina-Guevara,
Appellant


On Appeal From the United States District Court
For the District of New Jersey
(D.C. Crim. Action No. 94-cr-00304-3)


Argued January 24, 1996

BEFORE:  STAPLETON, MANSMANN and LEWIS, Circuit Judges

(Opinion Filed September 26, 1996)

                                        Faith S. Hochberg
                                        Kevin McNulty
                                        Amanda Haines (Argued)
                                        Office of the U.S.
Attorney
                                        970 Broad Street
                                        Room 502
                                        Newark, NJ 07102
                                        Attorneys for Appellee

                                        Jeffrey A. Bronster
(Argued)
                                        DeCotiis, Philips &
Lundsten
                                        103 Eisenhower Parkway
                                        Roseland, NJ 07068
                                        Attorney for Appellant

OPINION OF THE COURT


STAPLETON, Circuit Judge:

Arleathea Molina-Guevara was convicted of importing, and conspiring to import, more than 500 grams of cocaine. She was sentenced to 84 months' imprisonment. On appeal, she challenges her conviction and sentence on several grounds, two of which we find meritorious. We agree that the district court abused its discretion by refusing to grant a mistrial after the prosecutor, in summation, (1) asserted that a government agent, if called to testify would have given inculpatory information about the defendant, and (2) improperly vouched for the credibility of two government witnesses. We will reverse the judgment of conviction and remand for a new trial.

I.

The evidence adduced at trial was almost entirely testimonial. The government had two key witnesses: Erick Palma, an alleged co-conspirator who had pled guilty and had agreed to cooperate with the government, and Special Agent Miriam Lugo of the United States Customs Service. Ms. Molina-Guevara ("the defendant") testified on her own behalf, denying any knowledge of or involvement in the alleged drug conspiracy, and called no other witnesses. The jury's decision, accordingly, rested on its determination of the credibility of the defendant and the two government witnesses.

Prosecution witness Erick Palma testified that he, the defendant, and the defendant's husband, Franklin Guevara ("Frank"), agreed to smuggle cocaine into the United States from Puerto Rico. Palma testified that, in June 1994, he went to the Guevaras' apartment at the defendant's direction and that the three conspirators spent the afternoon and evening planning the details of the drug trip. According to Palma's testimony, Frank gave Palma most of the instructions and had evidently masterminded the plot. At some point during this meeting, however, the defendant told Palma that the trip would be to Aruba, rather than to Puerto Rico. She gave him his ticket and brought him an atlas to show him Aruba's location.

The next day, the defendant and Frank, who ran a taxi company, drove Palma to the airport. Frank repeated the instructions, and sent Palma on his way to Aruba. Palma returned to Newark Airport three days later as planned, with seven pounds of cocaine in plastic bags taped to his stomach and legs. Agents of the United States Customs Service randomly selected Palma for examination and discovered the drugs.

The Customs agents questioned Palma, and he confessed that Frank had sent him to Aruba. He admitted that he had made two prior such trips to obtain drugs for Frank and the defendant. Palma told the agents that Frank had given him a pager number to

call on his arrival.

The agents arranged, with Palma's consent, to record Palma's telephone conversations, and had Palma call the pager number. The defendant placed the first two calls in response to Palma's page, and Frank placed the last three. The conversations between Palma and the defendant were primarily about Palma's lack of money and inability to get a taxi to give him a ride. Palma testified that he and the defendant made coded references to the drugs during their conversation. Frank ultimately told Palma on the telephone that he would send a cab to pick Palma up. It was the defendant who arrived at the Newark airport to retrieve Palma. At that point, Customs Agent Miriam Lugo and Customs Investigator Peter Edge arrested the defendant, read her her rights and questioned her.

Agent Lugo, the lead Customs agent, testified that the defendant lied at first during the interrogation, giving a false name, insisting that she was a taxi driver hired by a man she knew only as Frank to pick up a fare, and denying any knowledge of Palma or the drugs. Lugo testified that, after she had discovered that the defendant had no driver's license, much less a taxicab license, the defendant tearfully confessed that her husband was Frank Guevara, that Palma was smuggling drugs into the country for Frank, and that Frank had sent the defendant to get Palma because the authorities would be easier on her if she were arrested.

The defendant told Lugo where Frank would be waiting for them, and Lugo went to arrest Frank. Lugo saw Frank, but he managed to escape, and remains a fugitive today.

Lugo testified that the defendant told her that there was a plastic bin in the Guevaras' closet where Frank kept drugs. A subsequent search of the apartment confirmed the presence of the bin, but it was empty.

Agent Edge did not testify at trial.

The defendant's case was primarily based on her own testimony, during which she denied having told Agent Lugo that she knew anything about any drugs--in the bin, on Palma, or as any part of her husband's affairs. The defendant admitted that she initially had lied about her name during Agent Lugo's interrogation, but she insisted that she was no more than a driver, sent by Frank to pick someone up at the airport, with no knowledge of any drugs.

Defense counsel's strategy was to discredit the government witnesses at every turn, to suggest why Palma and Lugo had motivation or reason to lie or to provide inaccurate testimony, and to encourage the jury to believe that the defendant had been wrongly accused only because Frank--the true target of the government's efforts and the clear leader of the conspiracy--had escaped and remained a fugitive from justice.

In her initial summation, government counsel stressed that the existence of a conspiracy to smuggle drugs was acknowledged by both sides, as was the fact that the defendant came to the airport to pick up Palma, an act which would have had the effect of facilitating the conspiracy. The sole issue, the government stressed, was whether the defendant knew about the

drugs, an issue that required the jury to choose between the testimony of Palma and Lugo and the testimony of the defendant. Counsel attempted to anticipate the argument of her adversary:

> The defense counsel would have you believe that the government case is a pack of lies.  That Erick Palma lied, that Agent Lugo lied, but, of course, the defendant, herself, is telling the truth.

> * * *

> You must pick through the words, the ideas, the rhetoric and decide who is telling the truth and who is not.

> * * *

> When you think about the testimony and do your job; namely, determine the truth, there is truth in Erick Palma's testimony which is full of details which ring with truth.

> You hear the truth in Miriam Lugo's testimony.  Her testimony was corroborated by subsequent events and by the extent and detail.

> * * *

> If Mr. Palma had wanted to make up a big story in order to please the government, don't you think he'll make up a little better story?

> Think about it.  If he was lying, wouldn't he have said it was this defendant who masterminded the deal, that it was she who bought the ticket, that it was she who handed him the ticket at the airport, it was she and not her husband who give him directions, instructions what to do in Aruba?

> He was delivering the drugs to this woman and not her husband.

> He didn't say those things because he told you the truth.  The truth is that this defendant was a participant.  Not the only participant.  Maybe not the mastermind of the conspiracy.  But a participant, nevertheless.

> Now, Mr. Bronster [defense counsel] not only attacked the credibility of Erick Palma,

but of Agent Lugo as well.  In fact, because of the strength of Miss Lugo's testimony, he really had nowhere else to go.

* * *

Do you really think this agent made up all these details?  If not, do you think she would make up one tidbit or two and add it to an otherwise truthful report?

Why would she do it?  She has absolutely no reason to lie.  In fact, it is insulting to think the United States would put on such a witness.  Her memory of the events is unimpeachable.

App. at 24, 25, 25, 27-28, 28-29.

The prediction of government counsel, of course, came to pass.  Defense counsel, in his closing, attacked the credibility of both Palma and Lugo:

Now, yes, I am going to be arguing to you that Erick Palma's testimony was a pack of lies.  I don't have any great concern about doing that.  It is -- a little tougher is what I'm going to have to talk to you about Agent Lugo.  Because some of the things I say to you and are going to submit to you, yes, in fact, she does have some reason in this case to lie.  It is hard almost to use the word.

She's an agent of the United States Government.  Frankly, no matter what else I have said about her or will say about her in this courtroom, I have a lot of respect for her and the job that she does.  She does a job that, God knows, I know I wouldn't be able to do.

* * *

But the fact is, ladies and gentlemen, when she comes into this courtroom, when she sits on that stand, she's as human as any one of us.  We'll talk more in detail later.

Maybe you'll find that she hasn't intentionally lied to you about something.  Maybe she has erred.  Maybe she has stretched or maybe you're going to decide that she has lied.

App. at 36, 37.

Defense counsel's argument with respect to Palma was straightforward:

> Erick Palma was a man with a lot of problems. He gets caught with five bags of cocaine strapped to his body. Where has he got to go? He's got to give some help to somebody or he's got no way to help himself.
>
> Frank Guevara is gone. He's gone. Palma can't get on the witness stand and testify against Frank Guevara because there is no trial. The only thing of value he has is to come in and point a finger at her. The only bargaining chip he has.
>
> What motive does he have to do it? You heard from his testimony that under the statutes he was charged with he was facing up to 40 years.

App. at 41.

Defense counsel's attack on the credibility of Agent Lugo was more sophisticated:

> Agent Lugo has a very, very difficult job that she does. She has a very frustrating job. She works and works and works, along with her fellow agents, to stop this garbage that comes into the country. And for every one they catch, God knows how many get away. You can understand and accept the level of frustration that someone in her position would have.
>
> Now, along comes this case. A great bust. A great bust. I mean that sincerely. They get this guy coming in at the airport, all the stuff strapped to his body, and they nail him.
>
> Then they go the next step. They use him to try to get to the person who's masterminding the deal. They turn it around. They got the information. They find out it is Frank Guevara. Now they've got him. Now they've got a really big bust. They traced it back to the source.
>
> * * *
>
> They go to arrest him. They go upstairs and he's gone. He slipped out again. Twice. He's never been found.

Ladies and gentlemen, I'm asking you to put yourselves in Agent Lugo's position. How would you feel? How would you feel? You're out on the street risking your life to catch people like this and he slips away? (Slapping jury box.)

She's got a right to be angry. She's got the right to be frustrated.

Then, to make things worse, after they catch this guy with seven pounds of cocaine strapped to his body, he ends up sitting on the witness stand trying to get probation for himself.

So the guy who is carrying the coke is playing his deal. The guy who is masterminding it is gone.

What did he do? What did he do? Maybe by now, maybe with all the frustration, maybe because she wants so badly to see people punished for importing this garbage, maybe by now she even believes that Arleathea Molina told her that she met him. I don't know. If you find that easier to accept than to have to say to yourselves she's lying, that's fine. I don't care. As long as you realize she's human, too.

App. at 55-56, 57-58.

Government counsel, in accordance with standard practice, got the last word. She knew that Agent Lugo's testimony was the linchpin of her case and was quick to spring to her defense:

Ladies and gentlemen, before I get into the main part of my rebuttal argument here, there is something I have to talk to you about up front. A statement that Mr. Bronster made that I feel that I have to bring to your attention right away.

He got up here during his opening and then just now and said or gave reason for you to believe that this agent lied. That is ridiculous. This agent did not lie to you. I don't see any evidence anywhere in this case, and you shouldn't, either, that this agent fabricated evidence, that she added to her report.

* * *

Did Mr. Bronster ask a single question to
Mrs. Lugo about fabricating her notes?  No.
. . .

Did Mr. Bronster call another agent who
was in the room at the time Miss Guevara gave
her statement?

Of course, Mr. Bronster has absolutely
no obligation to put on a case, to get up
here and say a word.  It is my obligation,
the government's obligation, to prove beyond
a reasonable doubt that this defendant
committed these crimes.

But he has the ability to call.  He may
call.  Did he call the agent in the room with
Miss Lugo and ask questions about whether
this defendant talked about drugs?  Asked
questions about whether Miss Lugo way lying
in her testimony?

* * *

Ask yourself why Mr. Bronster didn't
call the other agent who was in the room.  If
he called that other agent, he'd have to
argue not only that Erick Palma lied and not
only that the United States agent lied, but
that another United States agent lied.

App. at 67, 68, 69.

Defense counsel made appropriate objections to the
government's rebuttal argument and moved for a mistrial.  His
applications were denied.

## II.

The district court had jurisdiction under 18 U.S.C.
§ 3231, and we have jurisdiction under 28 U.S.C. § 1291 and 18
U.S.C. § 3742.

We review a district court's decision not to grant a
mistrial on the grounds that the prosecutor made improper remarks
in closing argument for abuse of discretion, United States v.
Gambino, 926 F.2d 1355, 1365 (3d Cir.), cert. denied, 502 U.S.
956 (1991), and, if error is found, we apply harmless error
analysis.  United States v. Zehrbach, 47 F.3d 1252, 1264–65 (3d
Cir.) (en banc), cert. denied, 115 S. Ct. 1699 (1995).  The
standard that we apply in our harmless error analysis depends on
whether the error was of constitutional proportions.  United
States v. Zehrbach, 47 F.3d at 1265.  If we find constitutional
error, we may affirm only if the error is harmless beyond a
reasonable doubt.  Chapman v. United States, 386 U.S. 18, 24
(1962).  If the error does not involve a violation of a
constitutional right, we may affirm so long as there is a "high

probability" the error did not contribute to the conviction. United States v. Jannotti, 729 F.2d 213, 219-20 (3d Cir.), cert. denied, 469 U.S. 880 (1984).

## III.

The government chose not to call Agent Edge as a witness.  Prior to the rebuttal, the issue of whether the defendant had admitted knowledge of the conspiracy after her arrest could have been resolved by the jury only by assessing the relative credibility of the defendant and Agent Lugo.  In her rebuttal, however, government counsel represented to the jury that Agent Edge, if called as a witness, would have corroborated the testimony of Agent Lugo.  Thus, as defense counsel pointed out in his objection, the prosecutor made a representation as "to what some agent who [was] never called would have said."  App. at 69.  The defendant insists that this representation violated her rights under the Sixth Amendment to confront the witnesses against her.  We agree.  We also agree that this representation and other comments of the prosecutor improperly vouched for the truth of Agent Lugo's testimony.  We are unable to agree with the government that this prosecutorial misconduct was either harmless or improperly invited.

## A.

The Confrontation Clause of the Sixth Amendment is violated when a prosecutor informs the jury that there is a witness who has not testified, but who, if he had testified, would have given inculpatory evidence.  Hutchins v. Wainwright, 715 F.2d 512 (11th Cir. 1983), cert. denied, 465 U.S. 1071 (1984).  That is precisely what occurred here.  Contrary to the government's suggestion, this is not a situation in which a prosecutor did no more than ask the jury to draw an inference from the failure of the defense to call a witness who could be expected to support the defendant's position if it were truthful.  See, e.g., United States v. Keller, 512 F.2d 182, 186 (3d Cir. 1975); United States v. Kenny, 462 F.2d 1205, 1228 (3d Cir.), cert. denied, 409 U.S. 914 (1972).  The absent witness here was a government agent whose relevant knowledge would be known to the prosecutor, and the jury was told what the testimony would be; this was thus not a case in which the jury was merely asked to infer, based on all the circumstances, that the defense was privy to the same information and decided not to elicit the testimony because it was unfavorable.

## B.

A prosecutor may not properly vouch for the credibility of a government witness.  See, e.g., United States v. DiLoreto, 888 F.2d 996, 998-99 (3d Cir. 1989); United States v. Beatty, 722 F.2d 1090, 1097 (3d Cir. 1983).  As the Supreme Court noted in United States v. Young, 470 U.S. 1, 18-19 (1985):

> The prosecutor's vouching for the credibility
> of witnesses and expressing his personal
> opinion concerning the guilt of the accused
> pose two dangers:  such comments can convey
> the impression that evidence not presented to

the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.

In United States v. DiLoreto, we held to be improper vouching the following statement by the prosecutor: "We [the government] don't take liars. We don't put liars on the stand. We don't do that." 888 F.2d at 999. As we there explained:

The remarks [suggest] that the government, as a matter of policy in the prosecution of its cases, does not use liars as witnesses. No explanation was given, however, of how the government ascertains the honesty or veracity of its witnesses. Indeed, we have found nothing in the record upon which the prosecutor could have grounded his statement. There must then have been some other evidence, unknown or unavailable to the jury, which convinced the prosecutor that his witnesses were not liars. Obviously, the defendants were not confronted with this extraneous evidence and afforded cross-examination, nor was the jury given an opportunity to engage in its own evaluation. What the jury was led to do instead was merely to infer that other information existed which the government used to verify the credibility of its witnesses prior to introducing their testimonies at trial.

Id.

In this case, the prosecutor, in addition to representing that Edge's testimony would corroborate that of Lugo, told the jury that it was "insulting" and "ridiculous" to think that the United States would put on a witness who would lie and assured the jury that "[A]gent [Lugo] did not lie to you." App. at 29, 67, 67. We believe the combined effect was to suggest that the prosecutor knew more than the jury had heard and that it should be willing to trust the government's judgment. It follows that the prosecutor's comments violated our rule against vouching.

C.

Because the prosecution engaged in a course of conduct that violated the defendant's rights under the Sixth Amendment, we cannot allow the judgment against her to stand unless we can say that the improper comments were harmless beyond a reasonable doubt.

As we have noted, the crucial issue for decision in

this case was whether the defendant knew about the drugs.  The prosecution and the defense respectively tendered inculpatory and exculpatory interpretations of the coded language on the telephone surveillance tapes and reasonable minds could differ regarding their significance.  Since there was no other tangible evidence relevant to this issue, this left the jury with the task of deciding whether to believe Palma and Lugo or the defendant.  With respect to the former, the defense advanced and developed plausible theories as to why each of these witnesses might have misrepresented the facts, intentionally in the case of Palma and intentionally or unintentionally in the case of Agent Lugo.  In this context, it is not possible to affirm beyond a reasonable doubt that there was no prejudicial effect from the prosecutor's invocation of the testimony of the absent and uncrossexamined Agent Edge or from her assurance to the jury that government witnesses don't lie.  Accordingly, defendant's conviction cannot stand.

D.

The government invokes the doctrine of invited error. As we explained in United States v. Pungitore, 910 F.2d 1084, 1126 (3d Cir. 1990), cert. denied, 500 U.S. 915 (1991):

> The doctrine [of invited error] teaches that
> where a prosecutorial argument has been made
> in reasonable response to improper attacks by
> defense counsel, the unfair prejudice flowing
> from the two arguments may balance each other
> out, thus obviating the need for a new trial.
> Young, 470 U.S. at 12–13, 105 S.Ct. at 1045.
> We have interpreted the doctrine to mean that
> a prosecutor may neutralize improper defense
> arguments but may not rely on them as a
> "springboard" for the launching of
> affirmative attacks upon the defendants.

(citation omitted).

We find the doctrine of invited error inapplicable here because we can find no fault with defense counsel's conduct.  His defense, and his summation in particular, can accurately be described as vigorous advocacy entirely appropriate for a case that turned on the jury's assessment of the credibility of the witnesses.

IV.

The defendant mounts a number of other attacks on her conviction.  Having decided to reverse and remand for a new trial for the reasons we have already given, it is appropriate for us to address only those issues that are likely to arise again during the remainder of the proceedings.

The defendant contends that the district court erred in refusing to order production by the government of Agent Lugo's handwritten notes of her interview with the defendant, notes from which the agent's final report was prepared.  As the government conceded before us, production of these notes was required by Federal Rule of Criminal Procedure 16.  Whether or not this

violation was harmless is now a moot issue.  On remand, the notes will be produced.

The defendant also insists that the district court erred in denying her a suppression hearing pursuant to Massiah v. United States, 377 U.S. 201 (1964).  In Massiah, the Supreme Court held that the defendant's Sixth Amendment right to counsel had been violated when incriminating statements were used by the government at trial which it had deliberately elicited after the defendant's indictment and in the absence of his counsel.  Id. at 206-07.  We find Massiah inapplicable here.

The defendant and Palma exchanged eight letters while both were in prison.  As the defendant testified at trial, she initiated the exchange because she believed Palma would testify against her and she wanted to see if she could get information that could be used to discredit him at trial.  One of Palma's letters was written after he had signed his cooperation agreement with the government.  The defense secured the admission of these letters and elicited testimony regarding them during the defense. It argued that the letters indicated Palma was testifying against the defendant because she had rejected his sexual advances. Having thus affirmatively used the letters, we conclude that the defendant is not entitled to a hearing to determine whether they should be suppressed.

V.

We will reverse the judgment of the district court and remand for a new trial.