**UNITED STATES of America**

v.

**Jonathan W. HADRICK.**

**Criminal No. 96–12.**

United States District Court,
W.D. Pennsylvania.

April 2, 1997.

Jay J. Finkelstein, Marketa Sims, Federal Public Defender's Office, Erie, for Defendant.

John J. Trucilla, Mary Houghton, U.S. Attorney's Office, Erie, PA, for U.S.

## MEMORANDUM OPINION AND ORDER

McLAUGHLIN, District Judge.

After a jury trial, Defendant, Jonathan W. Hadrick ("Hadrick"), was convicted of possession of a prohibited object in a federal correctional institution in violation of 18 U.S.C. § 1791(a)(z) and (2). Presently pending before this Court is Hadrick's motions for a mistrial with prejudice, or in the alternative, a new trial on the grounds that the Prosecutor misrepresented evidence in her closing argument, improperly vouched for the credibility of a witness and presented false testimony. For the reasons stated below, Defendant's motion is denied.

### I.

On October 31, 1995, officers at the McKean Federal Correctional Institution at Bradford, Pennsylvania ("FCI McKean") discovered a shank[1] hidden in a pillow in Hadrick's cell. An investigation followed during which Hadrick was questioned by Special Agent William Turner ("Turner") of the Federal Bureau of Investigations. Hadrick admitted to Turner that the shank was his and gave Turner a detailed description of how he made it. The shank was later submitted to the FBI laboratory for forensic testing. Six of Hadrick's finger prints were obtained from the adhesive side of the tape.

At trial, Agent Turner testified he interviewed Hadrick and

> he [Hadrick] came off with the information that the item found in the pillow case was in fact his. It belonged to him, he had it approximately one month, he had made it himself. And I asked him what he made it from, and he told me it was a handle, the metal handle rod form a mop bucket. And he used sandpaper to sharpen it. And I asked him where he had obtained the white tape that was wrapped around the handle. He said that was obtained from another, he thought he had purchased it from another cell mate, excuse me, not cell mate, inmate, the identity of which he could not recall or didn't want to furnish. Then I asked him what else was on the shank or homemade knife. He said there was a—a cloth. I asked what that cloth was. He said it was either from a laundry bag string of from a shoe lace that he put on there.

(Tr. Vol II, Testimony of William Turner 9.)

The Defense, relying on a false confession theory, argued that the Prosecution could not prove Hadrick possessed the shank. The Defense contended that Hadrick falsely confessed in order to avoid implicating his cell mate, Willie Spain ("Spain"). The Defense also elicited testimony from Agent Turner that he may have shown Hadrick a photograph of the shank during the interview; and argued that Hadrick's knowledge of the shank could have been gleaned from looking at that photograph.

To persuade the jury to reject this false confession theory, the Prosecutor, in her closing argument, summed up Agent Turner's testimony concerning his interview of Hadrick as follows:

> And after he was given these rights and after he had executed his waiver, he made a statement to Agent Turner. And it wasn't a brief statement, it was very spe-

---

1. A "shank" is a home-made prison weapon resembling a knife that is made from a sharpened piece of steel. The shank in this case consisted of a sharpened steel rod which was bent into a loop at one end to form a handle. The handle was wrapped in white tape and a piece of string was attached.

cific. And he said many things in that statement.

First, that the shank was his. The Defendant said to Agent Turner the shank was his.

Second, he said that he made the shank.

Third, he said he possessed the shank for a month. A month.

He also told Agent Turner that the shank was made from a mop bucket handle.

And also that he has sharpened the end of the shank with sandpaper.

He further told Agent Turner that he made a loop on the handle and he put tape on the handle.

(Tr. Vol. III, Government's Closing Argument & Rebuttal, hereinafter "Govt.'s Closing," at 5.)

The Defense objected to the Prosecutor's statement concerning the loop on the handle as unsupported by Agent Turner's testimony. (Id.) At side bar, Defense counsel argued that the Prosecutor was relying on a misrepresentation of Agent Turner's testimony to improperly undermine its theory that Hadrick's description of the shank was based on the photograph. (Id.) The Defense contended that this misrepresentation was crucial because, in the photograph, the looped portion of the wire is covered by tape and, thus, the Prosecutor's misrepresentation improperly implied that Hadrick had knowledge of the shank which went beyond what he could have been gleaned from the photograph. (Id. at 5–6.)

The Defense's request for a curative instruction was denied.[2] The Prosecutor resumed her closing argument and repeated

---

**2.** The Court reasoned that it's standard jury charge contained an instruction that arguments of counsel are not evidence and that the jury's recollection of the evidence controlled. (Id. 5.)

**3.** Specifically, the Defense argued:
Now, you just heard in closing arguments from the prosecutor, the prosecution said to you, oh, yeah, and Mr. Hadrick told us that the shank was looped at the end. Now, ladies and gentlemen, as the judge will instruct you, your recollection controls in this case. I will tell you that Agent Turner never testified from that

---

her erroneous statement concerning the looped handle.

Defense counsel, in her closing argument, asked the jury to carefully recall Agent Turner's testimony and recognize that Agent Turner never testified about a looped handle.[3] Defense counsel also challenged the adequacy of the fingerprint analysis.

In rebuttal to Defense counsel's challenge to the fingerprint evidence, the Prosecutor argued:

Now, defense counsel said to you that we didn't go into detail on the actual points of the identification. The expert said to her on cross examination do you want me to go into each finger and each point, and did she ask him a question on that. No she did not. The expert rendered his opinion and he was convinced it was his opinion that the prints that he identified from the tape matched the exhibit, matched his known fingerprint card.

... She did not want to go into cross-examination on the points because the points are there, he told you have clearly twelve points [sic], I can make my comparison, I can render my opinion.

He is not biased, he works for the FBI lab, he's sent evidence and he merely performs tests. He came to you and he said he performs his tests and he made the comparison. And that meets beyond a reasonable doubt.

(Govt.'s Closing at 11.)

The Defense did not object to this argument. The jury returned a verdict of guilty.

## II.

Hadrick raises three arguments in support of a mistrial. First, Hadrick argues that the

---

witness stand that Mr. Hadrick told him that the end of this was looped. Each of you is going to have to think about whether you heard that from Agent Turner, whether the prosecution is telling you something now that you never heard from the witness stand, because you can only what you heard from the witness stand and not what you hear from us.... I submit that Agent Turner never testified that Mr. Hadrick told him that piece of metal was looped.

(Tr. Vol. III, Defense's Closing Argument 11–12).

Prosecutor misrepresented Agent Turner's testimony in her closing argument. Second, Hadrick argues that the Prosecutor improperly vouched for the credibility of its fingerprint expert. Third, Hadrick argues that the Prosecutor obtained the conviction with false testimony. We will address each of these arguments in turn.

### A. Misrepresentation of Evidence

 "Prosecutorial misconduct does not always warrant the granting of a mistrial." *U.S. v. Zehrbach,* 47 F.3d 1252, 1265 (3d Cir.1995). There can be no such thing as an error-free, perfect trial, and the Constitution does not guarantee such a trial. *Zehrbach,* 47 F.3d at 1265 (*citing U.S. v. Hasting,* 461 U.S. 499, 508–09, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983)). However, a conviction will be set aside when the prosecutor's misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (*quoting Donnelly v.. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)).

 The first step in the court's harmless error analysis is to determine whether an error is constitutional or non-constitutional. *U.S. v. Molina–Guevara,* 96 F.3d 698, 703 (3d Cir.1996) (citing *Zehrbach,* 47 F.3d at 1265). If the court finds a Constitutional error, it must set aside the conviction unless the error is harmless beyond a reasonable doubt. *Molina–Guevara,* 96 F.3d at 703 (*citing Chapman v. State of California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). If the error is non-constitutional, the court may uphold the conviction as long as "it is highly probable that the error did not contribute to the judgment." *Id.* (*citing United States v. Jannotti,* 729 F.2d 213, 219–20 (3d Cir.1984) *cert. denied,* 469 U.S. 880, 105 S.Ct. 243, 83 L.Ed.2d 182 (1984)); *Zehrbach,* 47 F.3d at 1265 (*citing Government of the Virgin Islands v. Toto,* 529 F.2d 278, 284 (3d Cir. 1976)).

In *U.S. v. Gatto,* 995 F.2d 449, 453 (3d Cir.1993), *cert. denied,* 510 U.S. 948, 114 S.Ct. 391, 126 L.Ed.2d 339 (1993), the Third Circuit observed that when a prosecutor resorts to evidence outside the record in her closing argument, it implicates the defendant's Fifth Amendment right to be judged solely on the evidence admitted at trial and to introduce contrary evidence and also the defendant's Sixth Amendment right to confront adverse witnesses because there is no opportunity to cross examine the prosecutor. *Gatto,* 995 F.2d at 455. The Third Circuit has cited numerous examples of Constitutional error.

In *United States v. Schuler,* 813 F.2d 978 (9th Cir.1987), the prosecutor told the jury in his closing argument that "defendant, who did not testify at his trial for threatening to kill the President, had laughed during testimony about other violent threats he allegedly made. This laughter was not the subject of testimony at trial." *Gatto,* 995 F.2d at 453. "In *United States v. Wright,* 489 F.2d 1181 (D.C.Cir.1973), the prosecutor told the jury in closing arguments that he found the murder charges against him humorous. Defendant did not testify and his demeanor was not in the record." *Id.* "[I]n *United States v. Pearson,* 746 F.2d 787 (11th Cir.1984), the prosecutor ... asserted that defendant had been moving his leg up and down during trial, demonstrating his nervousness and fear." *Id.* at 454. "In *United States v. Carroll,* 678 F.2d 1208 (4th Cir.1982), the prosecutor told the jury in closing argument that defendant, who elected not to testify in his trial for bank robbery, had examined bank surveillance photographs with his lawyer during trial because he knew about the photographs from having been in the bank to rob it." *Id.*

 In the above cited cases, the error was of Constitutional dimension because the prosecutor was asserting personal knowledge of facts at issue based on evidence outside the record. In the instant case, however, the Prosecutor was not asserting personal knowledge of facts outside the record, but rather was summing up the testimony of Agent Turner. Agent Turner's testimony was part of the record. There was no Fifth Amendment violation because the Prosecutor was not introducing additional evidence through her closing argument. There was no Sixth Amendment violation because the Prosecutor

was not testifying to facts based on first hand knowledge. The jurors were in a position to judge the accuracy of the Prosecutor's statement against their independent recollection of Agent Turner's testimony. The jurors were not asked to take the Prosecutor's word concerning facts not in evidence. Thus, we conclude that an error of Constitutional dimension, within the meaning of the above cited cases, did not occur here.

■ Having determined that the error was non-constitutional, we must now examine whether "it is highly probable that the error did not contribute to the judgment." *Zehrbach*, 47 F.3d at 1265 (*citing Toto*, 529 F.2d at 284). " 'High probability' requires that the court possess a 'sure conviction that the error did not prejudice' the defendant." *Zehrbach*, 47 F.3d at 1265 (*citing Jannotti*, 729 F.2d at 219–20). In determining prejudice, the court views the prosecutor's remarks in the context of the trial as a whole and considers: (i) the scope of the objectionable comments and their relationship to the entire proceeding, (ii) the ameliorative effect of any curative instructions given, and (iii) the strength of the evidence supporting the defendant's conviction. *Zehrbach*, 47 F.3d at 1265.

■ First, the scope of the Prosecutor's misrepresentation and its relationship to the entire proceeding weighs against finding prejudice. The misrepresentation was not broad and sweeping, and it did not involve a false assertion concerning the existence of a large amount of directly inculpatory evidence. Rather, it went to a relatively narrow factual issue concerning the believability of the Defense's theory that Hadrick falsely confessed.

Second, although a curative instruction was not given at the time of the Prosecutor's

misrepresentation of Agent Turner's testimony, other ameliorative factors existed. During its opening remarks, and as part of the jury charge, the Court instructed the jury that statements and arguments of counsel are not evidence and that the jury's recollection of the evidence controls.[4] Moreover, Defense counsel, during her closing argument, drew the jury's attention to the Prosecutor's misrepresentation of Agent Turner's testimony and asked the jury to carefully recall that testimony.

Finally, the "evidence clearly supported the Government's burden of proving" Defendant's guilt. *See Zehrbach*, 47 F.3d at 1267. Most notably, Defendant admitted making and possessing the shank. Defendant gave a detailed, accurate description of the shank and its construction. Corrections officers testified that Defendant had access to the equipment necessary to make it. Six of Defendant's finger prints were obtained from the adhesive side of the tape on the handle of the shank. The fingerprint evidence was not discredited in any meaningful sense.

Thus, we conclude that it is highly probable that the Prosecutor's misrepresentation of Agent Turner's testimony did not did not contribute to the judgment and thus did not "so infect the trial with unfairness as to make the resulting conviction a denial of due process."[5] *Darden*, 477 U.S. at 181.

## B. *Witnesses Vouching*

■ The Defense also contends that Prosecutor improperly vouched for the credibility of its fingerprint expert. Specifically, the Defense objects to the Prosecutor's comments concerning the Defense's failure to cross examine the expert concerning points of comparison, and the Prosecutor's comment that the witness was "convinced it was his opinion" and that he "is not biased."

---

**4.** The jury charge included the following instructions:

> Any statements, objections or arguments made by the lawyers are not evidence in the case. It is your recollection and interpretation of the evidence that controls, and what the lawyers said is not binding upon you.
> (Court's Jury Charge.)

**5.** Such a ruling does not give prosecutors *carte blanche* to misrepresent evidence. As the Third

Circuit had pointed out, standard 3–5.9 of the American Bar Association Standards for Criminal Justice states:

> It is unprofessional conduct for the prosecutor intentionally to refer to or argue on the basis of facts outside the record.

*See Zehrbach*, 47 F.3d at 1266 n. 12. The Court is satisfied that the Prosecutor's misrepresentation of the evidence was not intentional.

Since these comments were not objected to at trial, we will only reviewed them for plain error. *United States v. Bethancourt*, 65 F.3d 1074, 1079 (3d Cir.1995), *cert. denied*, 516 U.S. 1153, 116 S.Ct. 1032, 134 L.Ed.2d 109 (1996). "In order to be plain error, an error must not only be 'obvious,' it must also 'have affected the outcome of the District Court proceeding.'" *Bethancourt*, 65 F.3d at 1079–80 (*citing United States v. Olano*, 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); *United States v. Pungitore*, 910 F.2d 1084, 1125–26 (3d Cir.1990), *cert. denied*, 500 U.S. 915, 111 S.Ct. 2009, 114 L.Ed.2d 98 (1991)). The prosecutor's comments must be so serious as to "'undermine the fundamental fairness of the trial and contribute to a miscarriage of justice.'" *Id.* at 1080 (*citing Pungitore*, 910 F.2d at 1126).

The case to which Defendant cites, *U.S. v. Molina–Guevara*, 96 F.3d 698 (3d Cir.1996), does not support the proposition that the Prosecutor here improperly vouched for the Government's witness. In *Molina–Guevara*, the prosecutor: (i) implied that a person who had not testified at trial could corroborate the testimony one of the government's witnesses, (ii) told the jury that it was "insulting" and "ridiculous" to think that the United States would put on a witness who would lie, and (iii) assured the jury that its witness "did not lie to you." *Molina–Guevara*, 96 F.3d at 704. Defense counsel made appropriate objections and moved for a mistrial, but the applications were denied. *Id.* at 703. On appeal, Third Circuit held that the "combined effect [of the prosecutors conduct] was to suggest that the prosecutor knew more than the jury heard and that it should be willing to trust the government." *Id.* at 704–05.

*Molina–Guevara* is distinguishable because defense counsel objected at trial. Because defense counsel objected, the Court in *Molina–Guevara* could only affirm if it was "highly probable that the error did not contribute to the judgment." *Id.* at 704. Here, Defense counsel did not object at trial. We may affirm as long as the error did not "'undermine the fundamental fairness of the trial and contribute to a miscarriage of justice.'" *Bethancourt*, 65 F.3d at 1080. Defense counsel in this case was articulate and competent, and zealously represented her

client's interests in every facet of the case. "Yet, at the time of the [P]rosecutor's remarks, [s]he apparently heard noting in the Government's response warranting any objection." *Id.* Additionally, as indicated above, the evidence supporting a conviction was strong. We can not view the Prosecutor's comments as contributing to a miscarriage of justice.

### C. False Testimony

Finally, Defendant argues that the Prosecutor obtained his conviction with false testimony. Defendant's argument is without merit because it relies on excerpts of Agent Turner's testimony taken out of context.

Defendant cites to a portion of Agent Turner's testimony wherein he stated that Hadrick's cell mate, Spain, had not been "involved in informing the government of any information" in this case. (Testimony of William Turner 22). Defendant argues that this testimony is false because Agent Turner had reported in a FBI 302 that, when he questioned Spain after the shank was discovered, Spain told him the shank belonged to Hadrick.

Defendant's allegation of false testimony relies on a misunderstanding of the Prosecutor's use of term "informing." When taken in context, it is obvious that the Prosecutor used the term to mean 'voluntarily supplied information' concerning the case prior to discovery of the shank and not to mean 'responded to an interrogation in a manner that implicated Hadrick.' In fact, the Prosecutor clarified her use of term through the following redirect examination:

Q: Agent Turner, I want to make it clear, when I asked you the question concerning the information, that with regard to the time, I meant an informant prior to the incident, is that your testimony?

A: That is my testimony, no, there was not.

(Id. at 23.)

### III.

An appropriate order follows.