

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-19-1998

# United States v. Walker

Precedential or Non-Precedential:

Docket 97-3531

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"United States v. Walker" (1998). *1998 Decisions.* Paper 198.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/198

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed August 19, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 97-3531

UNITED STATES OF AMERICA

v.

ROBERT WALKER,
Appellant

On Appeal From the United States District Court
For the Western District of Pennsylvania
(D.C. Crim. No. 96-cr-00014E)

Argued: June 12, 1998

Before: BECKER, Chief Judge, WEIS, Circuit Judges
and DOWD, District Judge.*

(Filed August 19, 1998)

        SHELLEY STARK, ESQUIRE
        Federal Public Defender
        KAREN SIRIANNI GERLACH,
         ESQUIRE (ARGUED)
        Assistant Federal Public Defender
        415 Convention Tower
        960 Penn Avenue
        Pittsburgh, PA 15222

Attorneys for Appellant

_____

*Honorable David D. Dowd, Jr., United States District Judge for the
Northern District of Ohio, sitting by designation.

          LINDA L. KELLY, ESQUIRE
          United States Attorney
          BONNIE R. SCHLUETER, ESQUIRE
           (ARGUED)
          Assistant United States Attorney
          JARVIS F. TAIT, ESQUIRE
          Assistant United States Attorney
          633 United States Post Office &
           Courthouse
           Pittsburgh, PA 15219

          Attorneys for Appellee

OPINION OF THE COURT

DOWD, District Judge.

I. The Charge and Conviction.

The appellant, Robert Walker, an inmate at The Federal Correctional Institute (FCI) in McKean, Pennsylvania, prosecutes an appeal from his conviction and sentence of 18 months for possession of contraband in violation of 18 U.S.C. S 1791(a)(2).

On October 13, 1995, Walker was undergoing a strip search preparatory to being placed in a special holding unit within McKean. The two correctional officers conducting the search, Scott and Dubois, ordered Walker to remove his undershorts at which time Walker removed a ten-inch shank. In a subsequent interrogation on November 3, 1995 by William Turner, an FBI agent, Walker admitted to possession of the shank. Walker also admitted that he made the weapon, and that he had it for protection because of a fellow inmate problem.

II. The Alleged Error of Vouching.

On appeal, Walker's sole error advanced for reversal of conviction is the contention that the government prosecutor "vouched" for the three government witnesses: Scott, Dubois, and Turner. Walker argues that his defense

2

focused on the credibility of the three witnesses and the government vouching "undermined fundamental fairness of the trial and contributed to a miscarriage of justice."

III. The Setting.

A. The Opening Statements.

The government's opening statement summarized the expected testimony of Scott, Dubois and Turner. The defendant's opening statement emphasized that the defense would be questioning the credibility of the government witnesses.

B. A Review of the Testimony of Scott, Dubois, Turner and Zuniga.

Scott testified that he was working in the special housing unit[1] where Walker was transferred on October 13, 1995, and was present when Dubois conducted a visual search of Walker in a shower room. Scott indicated that Dubois conducted a visual inspection of the shower room before the search of Walker. Walker was ordered to remove his clothes while Scott held a plastic bag for Walker to put his clothes in. After Walker stripped down to his underwear and socks, Walker turned his back on Dubois and Scott. According to Scott, Dubois then ordered Walker to turn around, at which point Walker reached into his waist area and turned around with a shank in his right hand. Scott told Walker to place the weapon on the grill and step back. Scott picked up the weapon and put it in his pocket. He then wrote out an incident report and took a photograph of the weapon.

Dubois corroborated Scott's testimony. Dubois emphasized that when he requested that Walker turn around, Walker refused. Then he ordered Walker to turn around, but again Walker would not turn around. Dubois testified that he finally gave Walker a direct order to turn around, at which point Walker turned around with a shank in his right hand. Dubois testified that Walker put the shank on the grill where Scott grabbed it.

_____

1. The special housing unit is the area of the institution where prisoners who "create problems" out in the general population are placed.

FBI Agent Turner described his November 3, 1995 interview with Walker regarding the incident of October 13, 1995. He identified Lieutenant Zuniga as also being present at the interview. According to Turner, Walker was orally advised of his rights and then was given a form to read,[2] which Walker appeared to read and then signed. Turner and Zuniga also signed the form as witnesses.

According to Turner, Walker admitted that he had found a piece of metal which looked like a key ring outside the gymnasium of FCI McKean and straightened it. Walker claimed that the end of the ring was already flattened. Walker admitted to taking a piece of a sheet and wrapping it around the handle.

Lieutenant Zuniga testified that he was present during the interview of Walker by Turner on November 3, 1995. Zuniga indicated that Turner read Walker his rights and the waiver at the bottom of the form and asked Walker if he understood them. Turner then gave Walker the form to look over and asked him again if he understood his rights. Zuniga testified that Walker then signed the waiver. Zuniga also stated that he signed the form as a witness.

According to Zuniga, Walker was not threatened into signing the form and he appeared fully coherent. Walker told Zuniga and Turner that he made the weapon from a key ring that he found in the "rec yard." Walker said that he straightened the key ring and then sharpened it. Walker stated that he made the weapon for protective purposes due to a prior altercation with an unidentified inmate. Zuniga testified that Walker stated during his interview that he used sandpaper to sharpen the point of his weapon.

At no time was there any testimony that suggested an alleged bias or ulterior motive on the part of Scott, Dubois, Turner, or Zuniga in investigating and reporting this incident.

_____

2. The form contained in written form the same notification of rights that had just been given orally, along with a waiver at the bottom.

IV. The Alleged Vouching.

After reviewing the testimony and the stipulations, the Assistant United States Attorney (AUSA) indicated that the only contested issue was whether Walker possessed the shank. Then the AUSA argued:

> Now, ask yourselves what motivation would Officer Robert Scott and former Officer Raymond Dubois have to come in here and lie to you. What motivation. I submit to you that they have no motivation to lie to you. I submit to you that you can determine, using your common sense and your judgment, you can determine the credibility of those two and the only two eyewitnesses to the search . . .

> Now, in addition, we went further, we then called Agent Turner . . . What motivation would he have to come into this courtroom and lie to you. . . [summary of Turner's testimony] . . . I submit to you that Agent Turner would have no motivation to come into this courtroom and make these things up. I submit to you that Agent Turner corroborated the direct evidence of the two and the only two eyewitnesses.

After final argument advanced on behalf of Walker in which Walker's lawyer questioned the Government's proof and the credibility of the witnesses by declaring that there should have been a video of the search and a recording of the alleged confession and imploring the jury to not act as a rubber stamp for the Government, the AUSA responded in part as follows:

> The testimony was, the testimony of the two officers that have no motivation to lie to you, the testimony was that it came out of the underwear. This was a strip search. They had two officers behind the bars looking and they told you, the eyewitness testimony, that is evidence of this crime. And we submit to you that we have proven that beyond a reasonable doubt. . . .

> And we submit that when you think about the case with your judgment and your wisdom and you take into account that there were only two eyewitnesses and they have told you that they saw the defendant with

the object, that, ladies and gentlemen, is proof beyond
a reasonable doubt.

V. The Concept of Vouching Discussed in Genera l.

Vouching constitutes an assurance by the prosecuting
attorney of the credibility of a Government witness through
personal knowledge or by other information outside of the
testimony before the jury. United States v. Lawn, 355 U.S.
339, 359 n. 15, 78 S.Ct. 311, 323 n. 15, 2 L.Ed.2d 321
(1958). See also United States v. Neceochea, 986 F.2d 1273,
1276 (9th Cir. 1993). A prosecutor's vouching for the
credibility of a government witness raises two concerns: (1)
such comments can convey the impression that evidence
not presented to the jury, but known to the prosecutor,
supports the charges against the defendant and can thus
jeopardize the defendant's right to be tried solely on the
basis of the evidence presented to the jury; and (2) the
prosecutor's opinion carries with it the imprimatur of the
Government and may induce the jury to trust the
Government's judgment rather than its own view of the
evidence. Young, 470 U.S. at 18, 105 S.Ct. at 1048; United
States v. Molina–Guevara, 96 F.3d 698, 704 (3d Cir. 1996).

While it was formerly the rule in this Circuit that
vouching for a witness based on information not in the
record required reversal per se, United States v. DiLoreto,
888 F.2d 996, 999 (3d Cir. 1989), such comments now
must be analyzed on a case by case basis. United States v.
Zehrbach, 47 F.3d 1252, 1267 (3d Cir. 1995). 3 This Circuit
has analyzed vouching in a number of cases, and a review
of the case law will be helpful to put this case in context.

VI. A Review of the Case Law.

In United States v. Gallagher, 576 F.2d 1028, 1040–43
(3d Cir. 1978), the prosecutor told the jury during opening
_____

3. Zehrbach, 47 F.3d at 1267, expressly overruled DiLoreto. This Circuit,
sitting en banc, held that the per se  reversal rule of DiLoreto
conflicted
with the case by case analysis of prosecutorial misconduct required by
the Supreme Court in Young, 470 U.S. at 11–12, 105 S.Ct. at 1044–
1045.

6

statement that the Government's testimony would come from the mouths of "truthful, credible" witnesses, and that all one witness "could testify to is the truth." Id. at 1041. This Court held that improper vouching had occurred, but did not grant the defendant a new trial. We explained that "in view of the amplitude of the evidence proving the appellant's guilt, we cannot say that the unfortunate statements quoted above alone require reversal."

In United States v. Swinehart, 617 F.2d 336, 338-340 (3d Cir. 1980), the prosecutor in closing argument stated that the Government's expert witness "is an honest witness." Id. at 339 n. 3. He also stated that this witness "of all witnesses and I believe that all the witnesses that testified [sic], testified honestly was one of the most honest." Id. The prosecutor went on, "I suggest that the expert in this case who testified concerning the questioned documents, that his testimony is totally worthy of belief." Id. We once again expressed our disapproval at these comments and held that they constituted improper vouching by the Government's attorney. Id. However, we held that the improper comment did not warrant reversal because the jury would have convicted the defendant even had it not been exposed to the improper prosecutorial comments. Id.

In United States v. Beaty, 722 F.2d 1090, 1097 (3d Cir. 1983), the prosecutor stated during summation that the witnesses who had appeared pursuant to a plea-bargain "promised to tell the truth and they were telling the truth before the judge who will sentence them in this matter. . . ." The court held that this comment constituted vouching. Id. However, the court held that this comment was not prejudicial. We explained, "[t]he prosecution witnesses' credibility was a hotly contested issue throughout the trial. The jury was, therefore, more likely to view this statement as an argument than as a revelation." Id. We also noted that there was overwhelming evidence of guilt, and that the judge's instructions dispelled any improper inferences that the jurors may have drawn. Id.

In DiLoreto, 888 F.2d at 998-1000, the prosecutor stated during rebuttal in reference to a witness that was appearing pursuant to a plea bargain that, "[I]f they lie, that bargain is off . . . We don't take liars. We don't put liars on the

stand. We don't do that." Id. at 999. We construed this statement by the prosecutor as an assertion to the jury that the government does not use liars as witnesses in its cases. Id. In this light, we held that the comment made by the prosecutor during rebuttal was improper vouching. Id. at 1000. Since we had not yet adopted a case-by-case analysis for comments based on evidence not in the record, we did not inquire into whether the above quoted statement was prejudicial. We instead held that it was reversible error per se. Id.

In United States v. Pungitore, 910 F.2d 1084, 1120–1127 (3d Cir. 1990), the prosecutor made several remarks during rebuttal argument that the defendant challenged as vouching.4 The success of the government's case hinged on

_____

4. The prosecutor made the following comment about the FBI agents and state law officers who testified at trial:

> the FBI agents and state troopers in this case are not criminals. There's no evidence to indicate that those good men suborned perjury or made up anything and that's why the Government brought them in[,] so that you could judge their credibility from the
> witness stand. Id. at 1123.

The prosecutor further urged the jury to consider the oaths of office taken by the law enforcement officers:

> You decide if it was [the defense witness] that was telling the truth
> or if it was all those FBI agents and state troopers who swore an oath who many of them told you have been agents and troopers for 19 years, 18 years, 17 years, you decide if they put their jobs, their
> careers and everything they worked for all those years on the line to
> fabricate testimony and put words in a witnesses mouth. Id. at 1123 n.56.

Lastly, the prosecutor attested to the integrity of the prosecutorial team and commented upon the testimony of two of the Government's witnesses:

> We're [the prosecutorial team] and make no mistake about it. What he's telling you, what a lot of these defense attorneys are telling you is that we fed this information to those Defendants, and
> you know what? You've heard us throughout the course of this trial. I'm not a genius but I'm not that dumb that I casually mentioned things to them without knowing exactly what I'm doing. I'm not that

stupid . . . Those FBI agents, those state troopers, those
policemen,

8

the credibility of the two government witnesses. Id. at 1120. The defense strategy was to attack the credibility of these witnesses. Id. The defense counsel had suggested that federal and state law enforcement officers had fabricated the government witnesses' testimony. Id. at 1121. The defense counsel made accusatory remarks during opening statement, vigorously cross-examined the government witnesses, and made the integrity of the government personnel the central theme of their closing arguments. Id. at 1121–1122.

We held that the statement by the prosecutor that,"the only way they got their stories together is if law enforcement told them each what to say[,] and there is nothing to indicate that happened, and it didn't happen," was not vouching. Id. at 1124. We explained that the statement did not suggest that the prosecutor had access to undisclosed facts that would support the credibility of the government witnesses. Id. "Instead, faced with contradictory testimony regarding the preparation of its witnesses, the prosecutor urged the jury to accept the testimony most favorable to the government. This, in itself, was proper argument." Id. at 1125.

We also held that the prosecutor's comment that the FBI agents were brought in to testify because they were not criminals was not vouching. Id. at 1125 n. 57. We noted that, in context, the comment merely points to the lack of any compelling evidence that the officers had engaged in any misconduct. Id. We observed that "[o]ur precedents do not constrain a prosecutor from pointing to an absence of evidence which might reflect negatively on his witnesses, so long as he does not suggest the existence of undisclosed facts which would support a favorable credibility determination." Id.

_____

       they're not real stupid either. The only way that[the government witnesses] testimony could be consistent in this case is one of two ways. They're either telling the truth or . . . the only way that they got their stories together is if law enforcement told them each what to say[,] and there is nothing to indicate that that happened, and it didn't happen. Id. at 1123.

Lastly, we held that the comment by the prosecutor concerning the credibility of testifying law enforcement personnel and the prosecutorial team was vouching because it invoked facts outside the record to assure the jury that they would not lie because lying would jeopardize their careers. Id. "We observe that there was no evidence backing the prosecutor's comments that the U.S. Attorneys and law enforcement officers could not have behaved as unscrupulously as defense counsel alleged they did without violating their oaths of office and jeopardizing their careers." Id. However, we held that this vouching did not require reversal because it fell squarely within the invited response doctrine.5

More recently, in United States v. Bethancourt, 65 F.3d 1074, 1079–1080 (3d Cir. 1995), the defendant challenged the integrity of the Drug Enforcement Agents who testified at trial.6 The prosecutor responded that the defendant's argument was improbable and that the witness did not lie.7 On appeal, the Government conceded that the prosecutor's

_____

5. The invited response doctrine "teaches that where a prosecutorial argument has been made in reasonable response to improper attacks by defense counsel, the unfair prejudice flowing from the two arguments may balance each other out, thus obviating the need for a new trial." Id. at 1126. The prosecutor may not use the improper remarks of the defense counsel as a springboard for the launching of affirmative attacks upon the defendants. Id. The doctrine's reach extends only to defensive, as opposed to offensive, argument by the prosecutor. Id. at 1127.

6. The defense counsel "also argued that the government agents typed up the confession and `they put stuff in there that[the defendant] was never gonna agree to;' and that faking his signature to the confession `tells you
[the jury] that in no way are they the statements, are they the words, are they the concepts, or is that the confession of [the defendant]. It's theirs
and they tried to make it his.' " Id. at 1079.

7. The prosecutor stated:

     For what, ladies and gentleman? He's gonna risk his career? He's gonna risk his job? He's gonna risk going to jail? For what? To lie to you on the stand, ladies and gentleman? I submit not, ladies and gentleman . . . [the prosecution's witnesses] don't make up lies.
And
     they didn't lie here and they're not lying to you, ladies and gentlemen, when they tell you what they did. And they're not lying to you when they tell you that defendant . . . talked to them about the statement. Id. at 1079.

remarks were "ill-advised". Id. We held that these statements did not amount to plain error. Id. at 1080. We noted that: (1) the comments in rebuttal were isolated and followed an untainted closing; (2) the district court gave clear instructions to the jury; and (3) the evidence produced at trial against the defendant was overwhelming.

Most recently, in Molina-Guevara, 96 F.3d 698, 703-705 (3d Cir. 1996), the prosecutor during rebuttal represented that an uncalled witness would have corroborated the testimony of the United States Customs Service Agent who testified at trial and whose credibility was at issue. Id. at 703. The prosecutor further told the jury that it was "insulting" and "ridiculous" to think that the Government would put a witness on the stand who would lie. Id. at 704. The prosecutor also assured the jury that the agent in question "did not lie to you." Id. We held that these statements were vouching and impermissible. Id. at 705. Since the defendant made the appropriate objections and moved for mistrial, we applied a harmless error analysis. Id. at 703. We held that because the prosecutor's rebuttal referenced a potential witness who never took the stand, the defendant's Sixth Amendment rights under the Confrontation Clause were violated. Id. at 705. Accordingly, we reversed the conviction because we could not say that the improper comments were harmless beyond a reasonable doubt.

Our case law indicates that to find vouching two criteria must be met: (1) the prosecutor must assure the jury that the testimony of a Government witness is credible; and (2) this assurance is based on either the prosecutor's personal knowledge, or other information not contained in the record. Thus, it is not enough for a defendant on appeal to assert that the prosecutor assured the jury that a witness' testimony was credible. The defendant must be able to identify as the basis for that comment an explicit or implicit reference to either the personal knowledge of the prosecuting attorney or information not contained in the record. See Lawn, 355 U.S. at 339 n. 15, 78 S.Ct. at 323 n.15. It follows that where a prosecutor argues that a witness is being truthful based on the testimony given at trial, and does not assure the jury that the credibility of the

11

witness based on his own personal knowledge, the prosecutor is engaging in proper argument and is not vouching. See Pungitore, 910 F.2d at 1125. Likewise, prosecutorial comment that points to a lack of evidence in the record which supports a defendant's argument that the witness is not credible is proper so long as the comment does not constitute an assurance by the prosecutor that the witness is credible. See Pungitore, 910 F.2d at 1125 n. 57.

A prosecutor may argue in the negative that the assertions made by defense counsel that a witness is lying are not supported by the testimony in the record. What the prosecutor may not do is take the next step. Once the defense counsel's argument is rebutted, the prosecutor's references to the witness' credibility should end. If the prosecutor proceeds further and starts arguing in the affirmative that the witness is credible, and does so based on either information that is not in the record or his/her own personal knowledge, then the prosecutor has engaged in vouching.

VII. A Plain Error Analysis of the Alleged Vou ching.

Walker did not object to the alleged vouching during trial. Therefore, we review the record for plain error. Bethancourt, 65 F.3d at 1079. "In order to be plain error, an error must not only be `obvious,' it must also `have affected the outcome of the District Court proceeding.' " Id. (citing United States v. Olano, 507 U.S. 725, 113 S.Ct. 1770, 1778–79, 123 L.Ed.2d 508 (1993)). "We may reverse only if we find error in the prosecutor's comments so serious as to `undermine the fundamental fairness of the trial and contribute to a miscarriage of justice.' " Pungitore, 910 F.2d at 1126.8

_____

8. Walker argues that the plain error analysis is not significantly different than the harmless error analysis. This is simply not true. In Olano, 507 U.S. at 734–35, the Supreme Court compared the harmless error standard to the plain error standard and noted, "[w]hile [harmless error analysis] precludes error correction only if the error `does not affect substantial rights', [plain error review] authorizes no remedy unless the error does `affec[t] substantial rights.' " Furthermore, the Court noted that, under plain error review, reversal is permitted but not mandatory. Id. at 735. Thus, a plain error that affects substantial rights, without more, does not mandate reversal, "for otherwise the discretion afforded by [the plain error standard] would be illusory." Id. at 737.

12

Walker contends that the AUSA improperly vouched for
Scott and Dubois when she stated:

> Now ask yourselves what motivation would officer
> Robert Scott and former Officer Raymond Dubois have
> to come in here and lie to you. What motivation. I
> submit to you that they have no motivation to lie to
> you. I submit to you that you can determine, using your
> common sense and your judgment, you can determine
> the credibility of those two and the only two
> eyewitnesses to the search.

The comment by the AUSA consists first of the rhetorical
question, "What motivation [would these witnesses have to
lie]?" This question is not vouching. It does not maintain
the credibility of the two witnesses by referring to
information outside the record, nor does it contain a
personal assurance of veracity. Viewed in context, the
statement merely points to the fact that Walker did not
produce any evidence indicating a motive on the part of the
law enforcement officers to lie. As we have previously
stated, it is permissible for a prosecutor to point to an
absence of evidence that might reflect negatively on her
witness, so long as she does not suggest the existence of
undisclosed facts that would support a favorable credibility
determination. Pungitore, 910 F.2d at 1125 n. 57.9

_____

9. Gallagher, 576 F.2d at 1041, is not to the contrary. Walker contends
that language identical to the rhetorical question analyzed here was held
to be vouching by the Gallagher court. In Gallagher, the prosecuting
attorney during opening statement asked, "What motive did [the
government witness] have to lie against [one of the defendants]? There is
none, because she was telling the truth." Id. We held that statement to
constitute vouching in its entirety. However, it should be clear from the
discussion supra, that it is the second sentence in the quotation and not
the first one that offends the rule against vouching. The statement,
"[t]here is none, because she was telling the truth," is vouching because
it assured the jury that the witness was credible, implicitly based on the
attorney's own personal knowledge. In other words, the prosecutor was
personally assuring the credibility of the witness. The rhetorical
question
posed in the first sentence did not personally assure the credibility of
the
witness, nor did it maintain the credibility of the witness based on
information not contained in the record. Therefore, the rhetorical
question was not, in and of itself, vouching.

13

The second part of the AUSA's remark during closing consists of the statement, "I submit to you that they have no motivation to lie to you. I submit to you that you can determine, using you common sense and your judgment, you can determine the credibility of those two [witnesses]. . . ." The phrase "I submit to you that," without more, does not constitute vouching. Submit means "[t]o commit to the discretion of another," or "[t]o yield to the will of another," or "to present for determination; as an advocate submits a proposition for the approval of the court." BLACK'S LAW DICTIONARY 1278 (5th ed. 1979). Thus, the phrase "I submit to you that," is merely a method of prefacing an argument and does not by itself constitute vouching. The phrase fails to meet the vouching standard because it does not assure the jury that the witness is credible, but instead asks the jury to find that the witness was credible. This is proper argument.

This reading of the phrase is supported by its context. The AUSA asked the jury to find that the witness was credible "using your common sense and your judgment. . . ." Clearly, the prosecutor is merely asking the jury to view the evidence in a light most favorable to her case, which is proper argument. See Pungitore, 910 F.2d at 1125.

Walker also challenges the following comment made during closing argument by the AUSA regarding the testimony of Turner, "What motivation would he have to come into this courtroom and lie to you . . . I submit to you that Agent Turner would have no motivation to come into this courtroom and make these things up." This comment is similar to the one analyzed above and is not vouching for the same reasons. The rhetorical question merely points to a lack of evidence produced by Walker in support of his claim that the government witnesses were lying. It is clear from the surrounding context that the second sentence merely asked the jury to accept the testimony in a light most favorable to the government. Thus, it is not vouching, but proper argument. Pungitore, 910 F.2d at 1125.

This is not to say, however, that prosecutors have free license to say whatever they please as long as they preface their remarks with the phrase, "I submit to you that." This phrase is not a magic talisman that wards off allegations of

14

vouching. Moreover, it is poor practice for federal prosecutors to frequently use rhetorical statements punctuated with excessive use of the personal pronoun "I". Such a practice runs the risk that the words that follow will convey the personal view of the prosecutor to the jurors. See United States v. Eltayib, 88 F.3d 157, 172-73 (2d Cir. 1996); United States v. Rivera, 22 F.3d 430, 437-38 (2d Cir. 1994). We endorse the alternative suggestions of our sister circuit in United States v. Nersesian, 824 F.2d 1294, 1328 (2d Cir. 1987), where the court directs:

> It is perfectly acceptable practice for a prosecutor to use language in addressing the jury such as "you are free to conclude," "you may perceive that," "it is submitted that," or "a conclusion on your part may be drawn," to mention only a few examples of unobjectionable phraseology. It is obligatory for prosecutors to find careful ways of inviting jurors to consider drawing argued inferences and conclusions and yet to avoid giving the impression that they are conveying their personal views to the jurors.

Finding no error, the judgment of the district court will be AFFIRMED.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

15