**Antoine ALICEA, Petitioner,**

v.

**UNITED STATES of America, Respondent.**

**CRIMINAL ACTION No. 07–737–15.**
**CIVIL ACTION No. 13–7235**

United States District Court,
E.D. Pennsylvania.

Signed April 23, 2015.

458

Antoine Alicea, pro se.

MEMORANDUM

EDUARDO C. ROBRENO, District Judge.

**Table of Contents**

 I. BACKGROUND AND PROCEDURAL HISTORY...........................463

 II. LEGAL STANDARD ...............................................464

 III. DISCUSSION .....................................................465
 A. Ground 1: Failure to Advise of the Right to Testify .....................465
 1. Evidence Supports the Quantity Determinations ......................466

 2. Petitioner Fails to Prove Prejudice ................................467
 B. Ground 2: Ineffectiveness Related to the Introduction of Evidence of
 Threats Made During Trial.........................................468
 1. Failure to Investigate ..........................................468
 2. Failure to Object to Inappropriate Legal Standard.....................469
 3. Failure to Move for Mistrial or for Other Curative Measures ...........470
 C. Ground 3: Failure to Request a Limiting Instruction ....................471
 D. Ground 4: Ineffectiveness for Cumulative Errors ......................472
 1. Improper Evidence of Coconspirator Statements .....................472
 2. Improper Evidence of Other Bad Acts .............................473
 3. Failure to Object During Michael Martin's Testimony .................474
 4. Failure to Object to the Recalling of Agent Bowman .................474
 5. Failure to Recognize a Discrepancy in Kareem Smith's Testimony.....475
 6. Ineffective Cross–Examination of Kareem Smith .....................475
 7. Ineffective Cross–Examination of James Robinson ....................476
 8. Failure to Object to the Summary Charts............................478
 E. Ground 5: Failure to Object to the Government's Statements .............479
 1. Vouching for Witnesses ........................................480
 2. Misstating the Record..........................................482
 3. Attacking Defense Counsel ......................................482
 4. Referencing the Social Benefits of Conspiracy Law ..................483
 F. Ground 6: Failure to Object to Jury Instruction ........................484
 G. Ground 7: Ineffectiveness at Bifurcated Sentencing Hearing .............485
 H. Ground 8: Ineffectiveness at Appellate Stage ..........................486

IV. CERTIFICATE OF APPEALABILITY ................................486

V. CONCLUSION ...............................................486

Antoine Alicea ("Petitioner") is a federal prisoner incarcerated at FCI–Elkton in Lisbon, Ohio. Petitioner filed a pro se petition under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence. In his petition, he makes numerous claims that his trial counsel was ineffective. For the reasons that follow, the Court will deny the petition without an evidentiary hearing or certificate of appealability.

## I. BACKGROUND AND PROCEDURAL HISTORY

On November 27, 2007, a number of defendants were charged in a three-count indictment. This case ultimately involved eighteen defendants, who were all members of the Smith Crack Cocaine Gang ("SCCG") drug organization, and who were charged with conspiracy to distribute 5 kilograms or more of cocaine and 50 or more grams of cocaine base ("crack") in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A). Certain defendants were also charged with substantive drug and firearm offenses, including Petitioner Antoine Alicea.

The SCCG conspiracy was a multi-state pyramidal drug network led by coconspirator Kareem Smith. Beginning in November 2002, Smith led at least seventeen other coconspirators in the purchasing of cocaine in Philadelphia, Pennsylvania, the "cooking" of cocaine into crack in homes and rented hotel rooms in Philadelphia and Maryland, and the selling of crack throughout Philadelphia and Maryland. Once Smith learned that the demand for crack was higher in Maryland, he moved a large part of the organization there to capitalize on those potential profits. The conspiracy ended with Smith's arrest in September 2007.[1] As the Court previously

---

**1.** Upon Smith's arrest, the Government learned of SCCG's pyramidal structure, with Smith at the apex. Of the other defendants, the Government learned that the second tier

found, Petitioner supplied powder cocaine to members of the conspiracy throughout the life of the conspiracy. *See United States v. Turnquest*, 724 F.Supp.2d 531, 536, 541–42 (E.D.Pa.2010), *aff'd* 497 Fed. Appx. 155 (3d Cir.2012) (concerning only Jamal Turnquest) and *aff'd in part, rev'd in part sub nom. United States v. Bland*, 502 Fed.Appx. 143 (3d Cir.2012) (concerning only Malik Bland).

After a trial that began on May 8, 2009, Petitioner was found guilty of Count One of the indictment—conspiracy to distribute 50 or more grams of crack and 5 kilograms or more of cocaine—and the jury determined that the amounts distributed in furtherance of the conspiracy were in excess of 5 kilograms and 50 grams, respectively. Petitioner was acquitted of Counts Two and Three—the charges of possession of cocaine with intent to distribute and possession of a firearm in furtherance of a drug trafficking crime.

Petitioner filed a post-trial motion for judgment of acquittal or for new trial. ECF No. 533. The Court denied the motion on March 10, 2010. ECF No. 760. Petitioner was sentenced on August 19, 2010, to 292 months' imprisonment, with five years of supervised release. ECF No. 818.

On September 17, 2012, the Court of Appeals affirmed the judgment of the District Court. ECF No. 919. Petitioner did not file a petition for certiorari in the United States Supreme Court. On December 13, 2013, Petitioner filed a petition pursuant to 28 U.S.C. § 2255, in which he makes numerous claims that his trial counsel was ineffective. ECF No. 952. For the reasons set forth below, Petitioner's claims have no merit, and therefore his petition will be denied.

## II. LEGAL STANDARD

■ A federal petitioner "claiming the right to be released ... may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a). Such a petitioner may attack his sentence on any of the following grounds: (1) "the sentence was imposed in violation of the Constitution or laws of the United States"; (2) "the court was without jurisdiction to impose such sentence"; or (3) "the sentence was in excess of the maximum authorized by law." *Id.* An evidentiary hearing on the merits of a petitioner's claims is necessary unless it is clear from the record, viewed in the light most favorable to the petitioner, that he is not entitled to relief. *See* § 2255(b). The court must construe a petitioner's pro se pleading liberally, *see Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), but "vague and conclusory allegations contained in a § 2255 petition may be disposed of without further investigation by the District Court." *United States v. Thomas*, 221 F.3d 430, 437 (3d Cir.2000).

■ A § 2255 petition can be based upon a violation of the Sixth Amendment right to effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 697, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). By claiming his counsel was ineffective, a petitioner attacks "the fundamental fairness of the proceeding." *Id.* Therefore, as "fundamental fairness is the central concern of the writ of habeas cor-

---

included Robert Williams, Antoine Alicea, and James Robinson as the cocaine suppliers; the third tier included Jamal Turnquest, Darryle Dunbar, and Landrum Thompson as principal managers; the fourth tier included Malik Bland, Daaniyal Muhammad, Vernice Garvin, Frederick Lecount, Steven Bernard, and Kenneth Baldwin as principal sellers; the fifth tier included David Spratt, David Carter, and Jeff Nunley as straight sellers; and the sixth tier included Jason Yurth and Michael Martin, in their minor roles as drivers and procurers of hotel rooms. All defendants either pleaded guilty or were found guilty at trial.

pus," "[t]he principles governing ineffectiveness claims apply in federal collateral proceedings as they do on direct appeal or in motions for a new trial." *Id.* Those principles require a petitioner to establish both that (1) his counsel's performance was deficient, and (2) the deficient performance prejudiced his defense. *Id.* at 687, 104 S.Ct. 2052; *Holland v. Horn,* 519 F.3d 107, 120 (3d Cir.2008).

To prove deficient performance, a petitioner must show that his "counsel's representation fell below an objective standard of reasonableness." *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052. The court's "scrutiny of counsel's performance must be highly deferential." *Douglas v. Cathel,* 456 F.3d 403, 420 (3d Cir.2006) (citing *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052). In raising an ineffective assistance claim, a petitioner first "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052. Next, the court must determine whether the "acts or omissions were outside the wide range of professionally competent assistance." *Id.*

To prove prejudice, a petitioner must affirmatively prove that the alleged attorney errors "actually had an adverse effect on the defense." *Id.* at 693, 104 S.Ct. 2052. The petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052.

## III. DISCUSSION

Petitioner raises at least eight different arguments that his counsel, Henry S. Hilles, III, was constitutionally ineffective. Each claim will be considered in turn.

### A. Ground 1: Failure to Advise of the Right to Testify

Petitioner claims that his trial counsel, Mr. Hilles, was ineffective for failing to advise him of his right to testify. Pet'r's Br. 63, ECF No. 952. The Third Circuit has stated that the *Strickland* standard is "applicable when a petitioner claims his attorney was ineffective by denying him his constitutional right to testify." *Palmer v. Hendricks,* 592 F.3d 386, 394 (3d Cir. 2010) (citation and internal quotation marks omitted).

While an accused has a constitutional right to testify in his own defense, he may waive this right. *United States v. Pennycooke,* 65 F.3d 9, 10 (3d Cir.1995) (citing *Jones v. Barnes,* 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983)). Petitioner and the Government disagree as to whether counsel failed to inform Petitioner of his right to testify, or whether Petitioner knowingly waived that right. In his unsigned affidavit, Petitioner attests that he informed counsel of his desire to testify at trial and at his sentencing hearing, but Mr. Hilles never advised him of his right to testify. Pet'r's Br. Ex. C, Alicea Aff. ¶¶ 3–7 [hereinafter "Alicea Aff."]. In response, the Government proffers Mr. Hilles' affidavit, in which he describes numerous discussions that he had with Petitioner regarding his right to testify and the advisability of taking the stand. Gov't's Br. Ex. A, Hilles Aff. ¶¶ 3–12, ECF No. 964 [hereinafter "Hilles Aff."].

The Court need not entangle itself in a he-said-she-said scrum of warring affidavits, however, because Petitioner fails to satisfy the prejudice prong of the *Strickland* inquiry. As the Supreme Court has clearly stated, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered.... If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect

will often be so, that course should be followed." *Strickland,* 466 U.S. at 697, 104 S.Ct. 2052; *see also United States v. Cross,* 308 F.3d 308, 315 (3d Cir.2002) ("[B]ecause it is preferable to avoid passing judgment on counsel's performance when possible . . . we begin with the prejudice prong." (citing *Strickland,* 466 U.S. at 697–98, 104 S.Ct. 2052)). Accordingly, the Court may skip the *Strickland* performance prong to reach the prejudice prong, as Petitioner has not shown that there is a reasonable probability that his testimony would have altered the outcome of his bifurcated sentencing hearing. *See Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

### 1. *Evidence Supports the Quantity Determinations*

■ Petitioner's claim of prejudice is greatly undermined by the evidence that overwhelmingly supported the Court's conclusions concerning the amounts of drugs attributable to each defendant—conclusions that ultimately determined the length of each defendant's sentence. This is particularly so, considering the conservative estimates employed by the Court. On July 16, 2010, the Court entered an order in which it (1) estimated that the amount of crack to have been distributed, for the life of the conspiracy, was 9 ounces per week, and (2) concluded that Petitioner participated in the conspiracy for 232 weeks. *Turnquest,* 724 F.Supp.2d at 536, 541. The Court also concluded that each defendant was responsible for the crack that was distributed during the weeks in which he was engaged in the conspiracy, as being reasonably foreseeable to him and part of the jointly undertaken criminal activity. *Id.* at 538.

To determine the total quantity of crack attributable to each defendant, the Court multiplied 9 ounces by the number of weeks each defendant participated in the conspiracy. *Id.* at 540. In reaching these determinations, the Court relied on trial testimony, including that of the coconspirators, and concluded that the testimony provided reliable estimations of the drug quantities sold weekly. *Id.* The Court also properly conducted a "searching and individualized determination of drug quantities attributable to each defendant," *id.* at 537 (internal quotation marks omitted), and "carefully scrutinize[d] the government's proof to ensure that its estimates [were] supported by a preponderance of the evidence," *id.* (quoting *United States v. Paulino,* 996 F.2d 1541, 1545 (3d Cir.1993)).

As the Court found previously, Petitioner was involved from the conspiracy's beginning in 2002 until its end in 2007—for a total of 232 weeks—and he supplied powder cocaine to his coconspirators throughout the life of the conspiracy. *Id.* at 536, 541–42. It was estimated that, together, Petitioner and Robert Williams supplied well over 100 kilograms of powder cocaine to Smith, Landrum Thompson, and Steven Bernard for distribution in Philadelphia and Maryland. *See id.* at 538–39. Again, the Court found that "[t]his estimate [was] corroborated by testimony given at trial by cooperating [SCCG] co-conspirators, which specifies instances of drug purchases (from Defendants Williams and Alicea) . . . over the course of the conspiracy." *Id.* at 537. The Court further found that "[t]he testimony also indicates that the drug quantities distributed were known by each Defendant and/or were 'reasonably foreseeable in connection with the' joint criminal activity underway." *Id.* at 537–38 (quoting *United States v. Collado,* 975 F.2d 985, 995 (3d Cir.1992)). For these reasons, the Court determined that it was "appropriate . . . to attribute the full drug quantities sold each week to each individual Defendant for the length of their involvement in the SCCG conspiracy." *Id.* at 538.

The Court's quantity determinations were overwhelmingly supported by the ev-

idence. Smith's testimony revealed that his only two cocaine suppliers were his cousin—Williams—and Petitioner until approximately June 2006, when coconspirator James Robinson became a third source of cocaine (augmenting, not replacing, Williams and Petitioner). *See id.* at 540–41. Smith testified that after his release from prison in September 2002, he decided to go with Thompson and Bernard to Maryland to sell crack obtained from Williams and Petitioner. *See id.* at 538. Smith obtained cocaine from Petitioner at Petitioner's house on Reinhard Street, and from Williams at Williams' house on Old York Road. *Id.* at 538 n. 7. From September 2002 to November 2002, Smith was obtaining approximately 9 ounces of cocaine per trip to Philadelphia. *Id.* at 538. By November 2002, Smith testified that he was obtaining 18 ounces of cocaine from Williams and Petitioner (whoever had a supply), every two to three days, which he then transported to Maryland to be sold. *Id.* Smith estimated that by December 2002, he had increased his trips to Philadelphia from Cecil County, Maryland, to two to three trips per day, during which he would obtain 9 to 132 ounces of cocaine from either Petitioner or Williams. *Id.*

The Court conservatively estimated that the SCCG was distributing 9 ounces of crack per week. *Id.* at 540. Smith's testimony alone supports this modest estimation and would have supported a much higher weekly estimation, given his testimony that at one point he was making two to three trips per day to Philadelphia to obtain up to 13.6 ounces of cocaine per trip from Williams and/or Petitioner. *Id.* at 538. In addition, Smith's testimony made it clear that it was reasonably foreseeable to both Williams and Petitioner that the cocaine they were supplying was being resold by Smith and his associates to their customers in Maryland. Smith testified about conversations with both suppliers concerning the operation in Maryland,

their ability to sell a bag of crack cocaine that would bring $5 in Philadelphia for $20 in Maryland, and the crack's extreme popularity with Maryland users. *Id.*

Smith's testimony regarding Petitioner was also corroborated by the testimony of coconspirators Thompson and Bernard. Each stated that he met with Petitioner or Williams to obtain cocaine, either alone or accompanied by Smith, and each reported comparable quantities. *See id.* at 539. For instance, Bernard said that starting in 2002, he was purchasing roughly 4.5 ounces of crack cocaine every three days. Over time this amount increased, to the point that, in 2006, he would purchase approximately 4.5 ounces of crack twice a day. *Id.* This testimony illustrates the conservative nature of the 9–ounce–weekly estimate.

### 2. *Petitioner Fails to Prove Prejudice*

█ Petitioner argues that his testimony would have changed the outcome of his sentence. In light of the overwhelming and thoroughly corroborated evidence outlined above, however, it is not reasonably probable that, even if believed, Petitioner's testimony would have had any impact in the Court's determinations of drug quantity.

In his unsigned affidavit, Petitioner claims that if he had been properly advised by his attorney of his right to testify, he would have testified that the drug amounts testified to by Smith at trial were greatly exaggerated, and that he did not sell during certain periods. He also asserts that if some of his codefendants had testified at the sentencing proceedings—specifically, Williams, Bland, Bernard, and Thompson-they would have similarly testified that the drug amounts were exaggerated, and that Petitioner did not sell them cocaine during certain years of the conspiracy. However, Petitioner's conclusory assertions fall short of the stringent prejudice standard articulated in *Strickland.*

Petitioner's claims of prejudice, viewed in context, are not "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. His claim that Smith's testimony greatly exaggerated the drug amounts is unconvincing, given the fact that Smith's testimony was substantially corroborated by the testimonies of Petitioner's codefendants. Moreover, any risk of exaggeration was further mitigated by the Court's conservative 9–ounce–per–week estimate.

Petitioner's assertions as to his codefendants' likely testimonies are similarly unavailing. In particular, Petitioner claims that Bernard and Thompson would have testified that Petitioner did not sell cocaine to the group during certain years of the conspiracy. But such bald assertions conflict with the testimony actually offered by these defendants, *see Turnquest*, 724 F.Supp.2d at 539—which supported the Court's finding that Petitioner sold for the SCCG throughout the entire life of the conspiracy.

At best, Petitioner presents the remote possibility of a different outcome, which is insufficient to show prejudice. *See Strickland*, 466 U.S. at 694, 104 S.Ct. 2052 (requiring proof of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different"). In essence, Petitioner presents conclusory claims that his testimony would have swayed the Court—insufficient claims that do not account for the specific evidence which the Court considered at sentencing. Thus, Petitioner has failed to show prejudice, and his right-to-testify ineffectiveness claim must fail.

B. Ground 2: Ineffectiveness Related to the Introduction of Evidence of Threats Made During Trial

Petitioner next claims that Mr. Hilles was ineffective in how he handled the introduction of evidence that Petitioner threatened witness Darryle Dunbar during trial. Specifically, he asserts that Mr. Hilles failed to investigate the threats, failed to object to the Court's application of the wrong legal standard in determining the admissibility of the threats, and failed to move for a mistrial or other curative measures. Pet'r's Br. 66. For the reasons that follow, each argument must fail.

### 1. *Failure to Investigate*

■ Petitioner first argues that Mr. Hilles failed to investigate threats that Petitioner allegedly made to a witness in a holding cell, just before the witness testified at Petitioner's trial. The witness, Darryle Dunbar, testified at a hearing held to determine the admissibility of threatening statements made by Petitioner and three other defendants. Trial Tr. 145–65, May 13, 2009, ECF No. 568. According to Dunbar, Petitioner—whom Dunbar had known only by name up until that point—walked by Dunbar's cell, asking aloud who in the cells was named Darryle Dunbar. *Id.* at 150. When Dunbar did not respond, Petitioner proceeded to his own cell, a few cells down, and began yelling out threats. *Id.* In Dunbar's words, the threats were to "[k]eep his name out of my mouth and he know where I live at, Conestoga Street, 54th Street, and he said he would have everybody from the neighborhood come to trial so that [they] could see what I'm doing, testifying." *Id.* Petitioner further threatened Dunbar that he would "get[ ] his head cracked." *Id.*

At the hearing, Mr. Hilles objected to the admissibility of this evidence, arguing that the evidence was unfairly prejudicial. *Id.* at 168. The Government argued that the threats were admissible as evidence of consciousness of guilt. *Id.* at 166. Dunbar testified at this hearing about the specific details of the threats and was subjected to cross-examination by all defense

counsel, including Mr. Hilles. *Id.* at 154–63. At the conclusion of the hearing, the Court determined that the threats were admissible pursuant to Federal Rule of Evidence 404(b), as evidence of consciousness of guilt. *Id.* at 174–76.

After this evidence was offered at trial, Mr. Hilles cross-examined Dunbar about the alleged threats, emphasizing with his questions that Dunbar was unfamiliar with Petitioner and his voice and had never met Petitioner before the alleged threat occurred. *See* Trial Tr. 21, May 14, 2009, ECF No. 650. These points were again underscored in Mr. Hilles' closing argument urging the jury to reject the evidence. *See* Trial Tr. 114–16, May 28, 2009, ECF No. 577. However, Petitioner argues that Mr. Hilles should have done more, and contends that the evidence should never have been admitted.

Petitioner observes that Mr. Hilles did not interview any of the people in the holding cell where the threats were heard, nor did he interview any of the U.S. Marshals that heard and reported the yelling and threats. In his affidavit, Petitioner claims that he made no threatening statements to Dunbar—which, according to Petitioner, would have been verified by the marshals, had they been interviewed. Alicea Aff. ¶¶ 1418. In Mr. Hilles' affidavit, he asserts that he "did not conduct any independent investigation of these alleged threats in part because the Defendant admitted to [him] that he had, indeed, uttered aggressive remarks to Mr. Dunbar with the hope that Mr. Dunbar would ultimately refuse to testify at trial." Hilles Aff. ¶ 14.

Petitioner's failure-to-investigate argument is unavailing. Although, again, the Court is faced with greatly diverging affidavits, the Court's finding of Dunbar's testimony as credible was well supported, as his account was "straight forward [sic]" and evinced "a good recollection of an event that occurred just a few hours [prior to the hearing]." Trial Tr. 175, May 13, 2009. Moreover, "the events were reported by the marshals ... promptly and Mr. Dunbar was interviewed also shortly after the events occurred." *Id.* Under these circumstances, it is not surprising that Mr. Hilles did not further investigate an event that—based on substantial and corroborated evidence—allegedly occurred mere minutes before, in the midst of trial and in front of several witnesses.

Nevertheless, even assuming, arguendo, that Mr. Hilles was ineffective for failing to investigate the threats further, Petitioner still cannot satisfy the prejudice prong of *Strickland.* As mentioned in the previous section, the evidence presented at trial concerning Petitioner's involvement in the drug conspiracy was overwhelming—and the result would have been the same without the evidence of the threats. As before, Petitioner has failed to prove that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. Thus, Petitioner's failure-to-investigate argument falls flat.

### 2. *Failure to Object to Inappropriate Legal Standard*

■ Petitioner. further argues that counsel failed to object when the Court applied the incorrect legal standard in its ruling on the admissibility of the evidence of threats against Dunbar. In Petitioner's view, the Court "relied exclusively on *[United States v.] Brazell,* 102 F.3d 1120 (11th Cir.1997)]" in its decision to admit the evidence." Pet'r's Br. 70. This is simply not true.

The Court applied Federal Rule of Evidence 404(b) to evaluate the admissibility of the threat evidence—which is the rule applicable to evidence of wrongful acts that are "extrinsic" to the charged offense. *Huddleston v. United States,* 485 U.S. 681,

685, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988). The Supreme Court has established a four-prong test to determine the admissibility of evidence under Rule 404(b):

> (1) the evidence must have a proper purpose under Rule 404(b); (2) it must be relevant under Rule 402; (3) its probative value must outweigh its prejudicial effect under Rule 403; and (4) the court must [upon request] charge the jury to consider the evidence only for the limited purpose for which it is admitted.

*United States v. Sampson,* 980 F.2d 883, 886 (3d Cir.1992) (citing *Huddleston,* 485 U.S. at 691–92, 108 S.Ct. 1496). This is the standard that the Court applied in its decision to admit the threat evidence. Trial Tr. 174–76, May 13, 2009. Moreover, the Third Circuit has recognized that evidence of consciousness of guilt is properly admissible under Rule 404(b). *United States v. Kemp,* 500 F.3d 257, 296 (3d Cir.2007) (citing *United States v. Gatto,* 995 F.2d 449, 455 (3d Cir.1993)).

It is true that the Court mentioned the Brazel case in support of the proposition that the Court's role was to ensure that the testimony regarding the threats was credible enough to allow the jury to consider it, and it was for the jury to determine whether, based on the evidence presented, the threats actually occurred. Trial Tr. 166–67, May 13, 2009. But contrary to Petitioner's claim,[2] the Court did not rely on *Brazel* as the standard of admissibility. And given that Mr. Hilles cannot be considered ineffective for failing to object to the Court's application of the proper legal standard, Petitioner's claim founders.

### 3. *Failure to Move for Mistrial or for Other Curative Measures*

■ Petitioner next argues that Mr. Hilles was ineffective for failing to move for a mistrial or for other curative measures based on the fact that the Government's witnesses made it "abundantly clear" that Petitioner and the other alleged "threateners" were incarcerated. Pet'r's Br. 72. According to Petitioner, the Government represented to the Court that the cooperating witnesses could testify about the threats without making it obvious that the defendants were incarcerated, and in his view this breach led to a deprivation of his presumption of innocence. *Id.*

As previously mentioned, the threats made by Petitioner to Dunbar occurred in

**2.** Petitioner also claims that the Court should have applied the factors set forth in *United States v. Guerrero,* 803 F.2d 783 (3d Cir.1986):

> Elements that enter into this question include: the tendency of the particular conduct alleged to "suggest decision on an improper basis, commonly, though not necessarily, an emotional one[ ]" [;] the nature or style of the specific witness's narrative, *cf.[,] e.g., United States v. Burton,* 525 F.2d 17, 19 (2d Cir.1975) (harmless error to admit threat evidence where, among other things, "testimony in question was passed over quickly"); the likelihood that the testimony is true; and the sufficiency of the other evidence presented to make a reasonable connection between the defendant and the offense charged, *see, e.g.,* C. Wright & Graham, Federal Practice & Procedure § 5216. A final factor in considering the prejudicial nature of the evidence is the extent to which any possible inflaming of the jury can be cured by limiting instructions either at the time the testimony is tendered or when the case is submitted to the jury.

*Id.* at 786.

However, although the Court did not cite to *Guerrero,* the Court did in fact discuss the nature of Dunbar's narrative, the likely truthfulness of his account, and the sufficiency of the other evidence against Petitioner. Trial Tr. 174–76, May 13, 2009. The Court also stated that limiting instructions would be given upon request at trial and at the conclusion of trial. *Id.* at 176. Accordingly, Mr. Hilles could not be ineffective for failing to object to the Court's supposed failure to apply analytical factors that it did in fact apply.

the holding cell outside of the courtroom during trial. In his argument, Petitioner refers to a specific portion of Dunbar's testimony that occurred on May 14, 2009. Trial Tr. 7–10, May 14, 2009. However, a close reading of Dunbar's testimony, specifically pages 7–10, clearly demonstrates that the witness did not make it "abundantly clear" that Petitioner was incarcerated. The only reference made by the witness that can remotely be considered suggestive of Petitioner's incarceration was when the witness referred to Petitioner walking by his "cell." *Id.* at 9. This vague, passing reference is not a violation of Petitioner's constitutional rights. *See United States v. Palma–Ruedas,* 121 F.3d 841, 858–59 (3d Cir.1997) (holding that jurors' hearing of a veiled reference to defendants' confinement did not rise to a constitutional violation), *rev'd on other grounds sub nom. United States v. Rodriguez–Moreno,* 526 U.S. 275, 119 S.Ct. 1239, 143 L.Ed.2d 388 (1999); *see also Coles v. Folino,* 162 Fed.Appx. 100, 105 (3d Cir. 2005) (non-precedential) (holding that where defendant's confinement results from the case on trial, reference to defendant's incarceration is not improper).

Petitioner's argument that this reference [3] overcame his presumption of innocence misses the mark. The Court specifically charged the jury concerning the defendants' presumption of innocence. Trial Tr. 86–87, May 29, 2009, ECF No. 578. It is well established that the jury is presumed to follow the court's instructions. *Richardson v. Marsh,* 481 U.S. 200, 211, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987); *United States v. Hakim,* 344 F.3d 324, 326 (3d Cir.2003). Thus, Petitioner is incorrect in suggesting that a fleeting reference to a "cell" would be sufficient to overcome the presumption of innocence—particularly when the Court provided a clear and detailed instruction to the jury that the defendants were presumed innocent and that presumption remains unless and until the Government proves their guilt beyond a reasonable doubt.

Mr. Hilles' decision to forego making a request for a mistrial and to seek a curative instruction did not amount to ineffectiveness. It is readily apparent that the Court would not have granted a mistrial based on this passing reference. Also, a limiting instruction would have brought greater attention to this matter and made an otherwise unclear statement quite clear to the jury—leaving no doubt that Petitioner and the other defendants were incarcerated. As with Petitioner's other claims regarding Mr. Hilles' conduct vis-à-vis the threat evidence, this claim must fail.

C. *Ground 3: Failure to Request a Limiting Instruction*

In the same vein, Petitioner argues that Mr. Hilles' decision to forego a limiting instruction for the threat evidence amounts to ineffectiveness of trial counsel. Once again, Petitioner is wrong. Upon

---

**3.** Petitioner asserts in a footnote that "[t]he Government also reminded the jury during closing argument that the threats occurred while detained pre-trial, Tr. 5/28/2009, at 73–74." Pet'r's Br. 72. The record, however, reveals otherwise. In closing, the Government argued:

> And don't forget, ladies and gentlemen, consciousness of guilt. Judge Robreno will instruct you that threats against witnesses can be considered by you as evidence of

their knowledge of consciousness of guilt.... Bland and Turnquest and Alicea threatened Darryle Dunbar, just weeks ago, right before he testified before you.

Trial Tr. 73–74, May 28, 2009. That is the closest that the Government came to a reference to Petitioner's confinement, and it falls short. Nowhere did the Government mention or even suggest that the defendants were detained when the threats were made. Again, Petitioner is mistaken.

determining that the evidence of Petitioner's threats against a Government witness was admissible pursuant to Rule 404(b), the Court advised counsel that it was willing to give the jury a limiting instruction if requested. Trial Tr. 176, May 13, 2009. According to his affidavit, Mr. Hilles claims that he believed that such an instruction would bring greater attention to the evidence, and after discussing his views with Petitioner, as well as with the codefendants' attorneys, the decision was made to forego the instruction. Hilles Aff. ¶¶ 15–16.

If true, Mr. Hilles' strategy of declining to draw attention to the testimony by referencing it in a curative instruction fell well within the wide range of reasonable professional assistance; to be sure, Petitioner has failed to prove otherwise. *See Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. However, even assuming that Mr. Hilles' decision to refrain from requesting a limiting instruction was unreasonable, Petitioner has failed to show he was prejudiced by the omission. Given the overwhelming evidence against Petitioner, his conclusory claims that Mr. Hilles' failure "infect[ed] the entire trial with unfairness" are unavailing. As with the previous threat-evidence claims, Petitioner has not satisfied *Strickland's* demanding standard.

### D. *Ground 4: Ineffectiveness for Cumulative Errors*

Petitioner claims that he is entitled to relief based on the "cumulative effect" of other alleged errors that occurred during trial. Pet'r's Br. 76–86. To prevail on this claim, Petitioner must show that "the . . . errors, when combined, so infected the jury's deliberations that they had a substantial effect on the outcome of the trial." *United States v. Copple,* 24 F.3d 535, 547 n. 17 (3d Cir.1994) (quoting *United States v. Thornton,* 1 F.3d 149, 156 (3d Cir.1993)); *see also United States v. Hoffecker,* 530 F.3d 137, 171–72 (3d Cir.2008) (following

*Copple* ). Petitioner has failed to meet this burden, given that the issues about which he complains were not errors at all, and given the weight of the evidence against him.

Petitioner lists at least eight separate claims in support of this argument. The Court will treat each in turn.

### 1. *Improper Evidence of Coconspirator Statements*

Petitioner first claims that the admission of coconspirator statements under Federal Rule of Evidence 801(d)(2)(E) was improper. The statements in question were offered by several of Petitioner's coconspirators as they testified about conversations they had with Smith regarding Petitioner. Although defense counsel objected to the admission of these statements, the Court properly admitted them pursuant to Rule 801(d)(2)(E).

Rule 801(d)(2)(E) provides that "a statement made by a coconspirator of a party during the course and in furtherance of that conspiracy" is not hearsay and may be admitted as evidence against a coconspirator. For a court to admit the coconspirator statements, it must appear (1) that a conspiracy existed; (2) that the declarant and the defendant were both members of the conspiracy; (3) that the statements were made in the course of the conspiracy; and (4) that the statement was made in furtherance of the conspiracy. *Bourjaily v. United States,* 483 U.S. 171, 175, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987); *United States v. McGlory,* 968 F.2d 309, 333–34 (3d Cir.1992). In *Bourjaily,* the Supreme Court held that factual predicates necessary for determining the admissibility of hearsay evidence under Rule 801(d)(2)(E) must be established by a preponderance of the evidence. *See* 483 U.S. at 175–76, 107 S.Ct. 2775.

Here, Petitioner does not contest the fact that each of the *Bourjaily* factors were satisfied prior to the admission of the

statements, and Petitioner himself even points out that these coconspirator statements were corroborated by Smith's own testimony in court. Pet'r's Br. 77. Rather, Petitioner argues[4] that using these inculpatory statements against Petitioner does not align with "the purpose of admittance of co-conspirator testimony." *Id.* However, these statements are precisely the sort of statements that 801(d)(2)(E) deems admissible and defines as *not* impermissible hearsay. Moreover, as Petitioner acknowledges in his brief, defense counsel did object to the admission of this testimony. *Id.* at 76. Thus, Petitioner's counsel cannot be ineffective because the Court properly admitted this evidence over objection.

2. *Improper Evidence of Other Bad Acts*

■■■■ Petitioner next claims that the Court admitted evidence of other bad acts in error. In particular, he refers to Smith's testimony regarding the length of time that Petitioner supplied Smith with drugs, which included a period of time prior to the commencement date of the conspiracy in 2002:

Q: Okay. Anyone else that you were getting cocaine from in 2002?

A: Yes.

Q: Who was the other person or persons?

A: Toine. [Smith then identified Alicea in the courtroom.]

. . . .

Q: When did you first meet him? How old were you when you met Toine?

A: I met Toine in '98–like '96–I was, like—I was a teenager.

Q: You were a teenager?

A: Yeah, I'm sure.

Q: And where did Toine live in relation to where you lived?

A: A couple of blocks down.

Q: The same neighborhood in Southwest?

A: Yes.

Q: All right. Where do you remember first meeting the man you knew as Toine?

A: I met him on his block.

Q: And what was his block?

A: Reinhard Street.

Q: What hundred block of Reinhard Street was his block?

A: 5300.

Q: And did you know his particular house?

A: No.

Q: When did you first learn the particular house that he was in?

A: When I started dealing with him.

Q: And when was that?

A: That was a few months after I met him.

Trial Tr. 155–57, May 20, 2009, ECF No. 572. Petitioner argues that Smith's statement that Petitioner started dealing with him "a few months after [he] met him" in 1996 constitutes evidence of uncharged criminal acts that his counsel should have objected to as inadmissible and "highly prejudicial." Pet'r's Br. 77.

This evidence was not elicited or employed as impermissible propensity evidence under Rule 404(b).[5] Clearly, the

4. Petitioner also states that "the source of these statements here was a testifying witness, not an unavailable declarant." Pet'r's Br. 76–77. However, Petitioner may mistakenly be referring to Rule 804's exceptions for unavailable declarants; Rule 801(d)(2)(E) contains no such requirement.

5. Petitioner also claims that Smith's testimony is inadmissible under 801(d)(2)(E) because it was not "during and in furtherance" of the charged conspiracy. However, there is no declarant's testimony at issue here to implicate Rule 801's hearsay exclusions—these are Smith's direct statements given on the stand,

Government was focused on Petitioner supplying the organization from 2002, and the Government properly questioned Smith to determine the background of his relationship with Petitioner. That relationship did not simply spring into being in 2002, and Smith had to have met Petitioner at some point prior to their dealing. This background information was both relevant and admissible under Rules 401 and 402, and Mr. Hilles was not ineffective for not objecting to its admission.

### 3. Failure to Object During Michael Martin's Testimony

■ Petitioner next complains Mr. Hilles did not challenge the testimony of Michael Martin concerning his presence inside a vehicle when Petitioner received a gun from Smith in exchange for cocaine. *Id.* at 77–78. However, Petitioner simply ignores the record, as Mr. Hilles effectively cross-examined Martin about the encounters with Petitioner.

On direct examination, Martin testified that he drove Smith to meet with Petitioner for the purpose of obtaining cocaine, and during one of these encounters Petitioner received a gun from Smith in exchange for cocaine. Trial Tr. 238–44, May 18, 2009, ECF No. 570. On cross-examination, Mr. Hilles elicited that Martin was in the front driver seat of the vehicle facing forward and Petitioner entered the back seat, therefore Martin never saw Petitioner's face and could not identify him. Trial Tr. 30, May 19, 2009 ECF No. 571. Mr. Hilles also elicited that both encounters occurred at night, were brief, and Martin never spoke with Petitioner. *Id.* at 30, 33. Finally, Mr. Hilles elicited that when Martin testified before the grand jury he never mentioned that a gun was exchanged for cocaine. *Id.* at 31–33. Thus, Mr. Hilles not only tested Martin's veracity, he also challenged Martin's ability to observe the

events that he claimed had occurred. Clearly, this was an appropriate line of questioning and was within the realm of reasonable professional assistance. Accordingly, contrary to Petitioner's claim, the testimony was challenged, and his counsel was not ineffective.

### 4. Failure to Object to the Recalling of Agent Bowman

■ Petitioner claims that Mr. Hilles was ineffective for failing to object to the Government's calling of Special Agent Bowman as a witness several times during trial. This process ultimately benefited all parties, however, and it was not error for Mr. Hilles to agree to this procedure. But even assuming, arguendo, that it was error, Petitioner cannot show prejudice.

The investigation which led to the charges in this case lasted several years and was led by Agent Bowman. He was involved in numerous aspects of the investigation and coordinated the majority of law enforcement activities among the many agencies involved. At the beginning of trial, just prior to Agent Bowman's first appearance as a Government witness, the Government discussed on the record its intention to call the agent three separate times during trial. Trial Tr. 104–06, May 12, 2009, ECF No. 567. The reason for this was to present Agent Bowman's testimony in a logical manner, to avoid confusion of the issues, and to provide the parties with the opportunity to examine Agent Bowman on limited sets of issues. The parties agreed and this is how things proceeded until counsel for Robert Williams objected, not to the Government recalling its witness, but to the witness testifying about things that he previously testified to at a previous trial appearance. Trial Tr. 260, May 19, 2009. It was at this point that the Court raised a concern about the

---

when he was subject to cross-examination.

Therefore, Rule 801(d)(2)(E) is inapplicable.

Government's recalling of the witness. *Id.* at 260–64. However, when the issue was revisited the next morning, the Court allowed the Government to proceed as agreed to by the parties. Trial Tr. 3–7, May 20, 2009.

Petitioner believes that he was somehow prejudiced by this, but he fails to explain how exactly he was prejudiced. Clearly, had Mr. Hilles, the other defense counsel, and ultimately the Court not agreed to the Government's proposal for presenting Agent Bowman's testimony, the Government would have called him to the witness stand only once and elicited all of his testimony at that time. The content of his testimony would not have been any different and the cross-examination would have been the same. Petitioner has utterly failed to show that the jury's verdict would have been different had Agent Bowman only testified once.

5. *Failure to Recognize a Discrepancy in Kareem Smith's Testimony*

■ Petitioner next argues that Mr. Hilles failed to uncover a discrepancy regarding drug quantities in Smith's testimony, thereby missing a "golden opportunity to impeach Smith's credibility." Pet'r's Br. 78–79. On direct examination, Smith testified that in 2006, he relied on another coconspirator, Jeff Nunley, to drive from Maryland and pick up crack and transport it back down to Maryland. Trial Tr. 80–82, May 21, 2009, ECF No. 573. Although he initially gave Nunley 2.25 ounces of crack, *id.* at 83, this amount later increased to 9 ounces, two times per day, *id.* at 86. Upon receiving the crack, Nunley would take it to another coconspirator ("Junior"), who sold from the Knights Inn in Maryland. *Id.* at 83–85.

On one occasion, approximately one hour after Nunley delivered the crack to Junior at the Knights Inn, the police raided the hotel and recovered 4.5 ounces from Junior's room. *Id.* at 88–89. According to Petitioner, this amount contradicted Smith's earlier statement that he would give Nunley 9 ounces for Junior. Petitioner argues that Mr. Hilles was ineffective for not cross-examining Smith as to this discrepancy.

However, Petitioner fails to recognize that almost an hour elapsed from the time that Nunley delivered the crack to Junior and when the police arrived. During this time, Junior certainly could have made sales—particularly given the volume of drug sales that members of this organization were engaging in on a daily basis. In any event, this apparent discrepancy is a minor point that had little, if any, bearing on Mr. Hilles' strategy in cross-examining Smith—which primarily consisted of Mr. Hilles' attempt to show that Petitioner was merely involved in a buyer/seller relationship with Smith. *See id.* at 151–69.

Nevertheless, even assuming that this was an unreasonable error on Mr. Hilles' part, Petitioner has made no attempt to show how he may have been prejudiced by the alleged lapse. As mentioned earlier, Smith's testimony regarding the drug quantities involved in this conspiracy was substantially corroborated by the testimonies of his coconspirators. Even had Mr. Hilles harped on these discrepant figures, it would not have shifted the great weight of evidence against Petitioner. Thus, upon inspection, the glimmer of Petitioner's "golden opportunity" reveals only nonprejudicial iron pyrite.[6]

6. *Ineffective Cross–Examination of Kareem Smith*

■ Petitioner complains about Mr. Hilles' cross-examination on other grounds as well. For one, Petitioner claims that Mr. Hilles erred in eliciting inculpatory

6. Commonly referred to as "fool's gold."

testimony from Smith that did not come out on direct examination. Specifically, when asked on direct if he exchanged any items, other than money, for crack, Smith testified that he exchanged "a gun." *Id.* at 92. He further testified that he had exchanged crack with David Spratt for Spratt's "Glock . . . nine" firearm, and that he gave the gun to Petitioner. *Id.* at 93–94. On cross-examination, Mr. Hilles asked Smith about his suggestion in direct testimony that he gave the gun to Petitioner in exchange for cocaine. *Id.* at 154–55. Petitioner argues that Smith only said he gave the gun to Petitioner-he did not testify that he exchanged the gun for cocaine. Pet'r's Br. 79. Thus, Petitioner contends that Mr. Hilles was ineffective and "reckless" in eliciting this inculpatory testimony.

Again, Petitioner misreads or ignores the record. On direct, Smith clearly testified that "I gave *him* the gun like for the exchange for the crack because *he's* my man," and he confirmed for the Government that "he" was "Twan." Trial Tr. 93, May 21, 2009 (emphasis added). Even though Smith had previously discussed *receiving* the gun from Spratt, he also testified that, in exchange for crack, he *gave* the gun to Petitioner. *See id.* Accordingly, Mr. Hilles' cross-examination on this point was neither in error nor ineffective.

■ Petitioner also complains about Mr. Hilles' failure to effectively cross-examine Smith concerning his "highly exaggerated" estimates of the quantities of crack he and other members of his organization sold. Pet'r's Br. 79. Based on Petitioner's own calculations, *see id.* at 28 n. 37, 30 n. 41, he argues that had Mr. Hilles cross-examined Smith on these calculations, he would have discredited his own testimony.

But Petitioner ignores the fact that this exact line of questioning was used by another defense counsel, Laurence Narcisi, and it was not specific to his client Robert

Williams. Trial Tr. 138–43, May 21, 2009. Mr. Narcisi repeatedly confronted Smith about the amount of crack that he claimed was distributed and the amount of money he claimed was being generated each week, and pointed out that the math did not support Smith's testimony. For Mr. Hilles to engage in the same line of inquiry—once the subject had been thoroughly examined by other counsel—would have been redundant, and would have run the risk of alienating the jury. Thus, Mr. Hilles' decision was well within the range of reasonable professional judgment, and was not in error.

### 7. *Ineffective Cross–Examination of James Robinson*

■ Petitioner next challenges Mr. Hilles' failure to point out a discrepancy in his cross-examination of witness James Robinson. However, a thorough reading of Robinson's testimony shows that there was no inconsistency, and thus Petitioner's argument falls flat. Robinson testified as follows:

Q: Now, when you would see Twan, you indicated that you would get nine ounces of powder that he would cook [into] crack. How often would you get from him?

A: Every three days, three to four days. No more than four days.

Q: Pretty consistent basis?

A: Yes.

Trial Tr. 170, May 26, 2009, ECF No. 575. This testimony indicates that, at this particular point in time, Robison obtained 9 ounces of crack from Petitioner every three to four days. The testimony continued:

Q: And how long did that last for?

A: It lasted for almost a year, and then I went back to prison. And then I got back out, and then we started again.

. . . .

Q: And did you pick [up] where you left off with Twan?

A: Yes.

Q: Pretty regular?

A: Yes.

Q: Now, did there come a point in 2005 where you and Twan had a little bit of a problem?

A: Yes.

Q: And what was that about?

A: Just I was starting to buy more, I wanted to buy more, and he wanted to keep me at the same price, and I didn't think that was right. I was spending—

Q: So–I'm sorry.

A: I was spending enough money for him to come down.

Q: So you thought that the more you bought, the better the price it should be?

A: Yes.

Q: But he didn't agree with you?

A: No.

Q: When you say you started to buy more, I mean how much did it get up to? You started off at nine ounces, what did it get up to?

A: I wanted to buy a half a kilo.

. . . .

Q: Okay. But he was willing to give you a half a kilo at a time?

A: Yes.

Q: All right. And how often would you say that you would purchase a half a kilo of cocaine?

A: Well, it take me about—about a week, seven to eight days.

*Id.* at 170–72. Petitioner claims that this second exchange is inconsistent with the first—but he is mistaken. Robinson testified that when he began to purchase a half a kilogram (or roughly 18 ounces) of cocaine from Petitioner he expected a better price. Even though the total amount of cocaine purchased every seven or eight days remained the same (i.e., 18 ounces at once, rather than 9 ounces every three or four days), Robinson still expected a discount when he purchased the larger bulk quantity of half a kilogram. This was a reasonable commercial expectation—it is common sense to expect a lower price when a greater quantity is purchased. Accordingly, Mr. Hilles was not ineffective for not treating this point on cross-examination.

Petitioner also suggests that Mr. Hilles failed to attack Robinson on the issue of purchasing drugs on credit, but instead "legitimized" Robinson's testimony. Pet'r's Br. 80. During Mr. Hilles' cross-examination, Robinson mentioned that when he was buying 9 ounces, Petitioner would "front" him 9 additional ounces as well. Trial Tr. 172, May 26, 2009. Once Robinson started buying half a kilogram, however, he stated that he did not need to buy any more on credit—he had enough money to buy the entire half kilogram. *Id.* Petitioner argues that this is "entirely nonsensical," [7] and that Mr. Hilles' cross-examination improperly "legitimized Mr. Robinson's claims by asking if fronting drugs was 'uncommmon.'" Pet'r's Br. 80. But once again, Petitioner misses the point.

Under cross-examination by Mr. Hilles, Robinson acknowledged that it was not uncommon for a drug seller to front drugs to someone else whom they trust will pay the debt. Trial Tr. 187–88, May 26, 2009. Mr. Hilles later argued that fronting drugs is not evidence of conspiracy but instead evidence that two people know each other well enough to conduct a sale on credit. Trial Tr. 121–22, May 28, 209. This was a

---

**7.** The notion that Robinson could only afford to buy 9 ounces of cocaine at one point in time and that he could afford to purchase 18 ounces at a later point in time is entirely reasonable. Financial circumstances change.

reasonable point aimed at refuting the Government's theory that a sale of drugs on credit is evidence of a conspiracy. Contrary to Petitioner's claims, this was not error on Mr. Hilles' part.

Petitioner makes a few more passing jabs at Mr. Hilles' alleged "bungl[ing of] Mr. Robinson's cross-examination." Pet'r's Br. 80–81. Mr. Hilles emphasized Petitioner's effective tutoring of Robinson in avoiding the police, yet he overlooked Robinson's two arrests during the two years he worked with Petitioner; he missed other potential discrepancies in Robinson's testimony; and he did not mention the fact that Robinson lied to a Government agent and two prosecutors in connection with the case.[8] Trial Tr. 203–04, May 26, 2009. Even assuming that Mr. Hilles' cross-examination was less than perfect, Petitioner has failed to show that Mr. Hilles' "representation fell below an objective standard of reasonableness," *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052, and he has made no effort to describe how these supposed errors prejudiced him.

In reality, the record supports a finding that Mr. Hilles' cross-examination of Robinson was objectively reasonable. Right out of the gate, he attacked Robinson's credibility by pointing out that he had five prior felony drug convictions, two of which were still pending sentencing hearings. Trial Tr. 183, May 26, 2009. He emphasized that Robinson was facing significant penalties for his convictions in this case and that he was hoping to receive a benefit from the Government in exchange for his testimony. *Id.* at 184–86. Mr. Hilles then had Robinson acknowledge that he had committed perjury in connection with one of his open drug cases, when he testified at a hearing in state court. *Id.* Finally, in his closing argument, Mr. Hilles continued his attack on Robinson's credibility. Trial Tr. 110–11, May 28, 2009. Thus, Petitioner failed to show that his cross-examination of Robinson was either objectively unreasonable or prejudicial.

### 8. *Failure to Object to the Summary Charts*

Petitioner next complains that the Government's use of summary charts was inappropriate and Mr. Hilles was ineffective for failing to object to their admissibility and to request a limiting instruction. Pet'r's Br. 81–85. Specifically, Petitioner objects to the admission of (1) summary charts of Smith's cellphone contacts, and (2) a chart titled "Smith cocaine gang," which included the names and photographs of Smith's alleged coconspirators. *Id.* Petitioner asserts that these exhibits were employed impermissibly; again, Petitioner is wrong.

As to the summary charts of the cellphone contacts, Federal Rule of Evidence 1006 "permits parties to use charts or other exhibits to summarize voluminous materials if a summary would be helpful to the jury. Decisions in this connection are committed to the sound discretion of the trial court, which in this context is very broad." *United States v. Bansal*, 663 F.3d 634, 668 (3d Cir.2011) (citing *Pritchard v. Liggett & Myers Tobacco Co.*, 295 F.2d 292, 299 (3d Cir.1961)). The Third Circuit has indicated that the voluminous document requirement under Rule 1006 should not be interpreted literally or restrictively. *See United States v. Velasquez*, 304 F.3d 237, 240 (3d Cir.2002) (citing *United States v. Winn*, 948 F.2d 145, 157–59 (5th Cir. 1991)). A summary witness draws conclusions based upon the evidence presented at trial, and these conclusions can properly

---

8. Notably, Mr. Narcisi questioned Robison about this on recross, *see* Trial Tr. 204–05, May 26, 2009, and he likely undermined the witness's credibility—as Mr. Hilles would have, had he done the same in his cross-examination.

be reflected in summary charts. *See United States v. Stadtmauer,* 620 F.3d 238, 271 n. 38 (3d Cir.2010).

Here, the Government used charts to summarize the voluminous phone records and contact directories contained within several phones that were seized during the investigation. *See* Trial Tr. 101–42, May 27, 2009, ECF No. 576. The Government called records custodians from each phone company to authenticate the phone records prior to their admission into evidence. Trial Tr. 245–59, May 21, 2009. Agent Bowman then described how he obtained those records and entered them into a database to analyze the information. Trial Tr. 104–07, May 27, 2009. All of the information in the charts came directly from the records, which had all been previously admitted as evidence in the case. *See id.* at 106.

Petitioner argues that the summary charts of Smith's cellphone contacts "were distorted to exclude all reference [to calls] to and from others that the Government deemed of no interest." Pet'r's Br. 82. Petitioner also claims that the Government's reference to the phone entries as "conversations" was misleading, given that some calls lasted only seconds, and may have been attempted calls going to voicemail. *Id.*

But Petitioner's qualms with the Government's use of the cellphone summary charts do not change the fact that the charts were clearly admissible pursuant to Rule 1006 and that they were properly admitted under the Court's broad discretion. The Government's use of the charts was indeed appropriate, as all of the information contained therein and the inferences and conclusions drawn therefrom were supported by evidence admitted at trial. Even if Mr. Hilles had objected, the evidence would have been admitted and, thus, Petitioner was not prejudiced by Mr.

Hilles' reasonable decision not to object to the cellphone summary charts.

 Petitioner also complains about the Government's use of a chart titled "Smith cocaine gang" in its closing argument. The chart contained photographs of the defendants whom the Government argued were members of the charged conspiracy. Pet'r's Br. 82. But there was nothing improper about the use of such an exhibit. A district court has discretion to permit a party to use a demonstrative exhibit or visual aid during opening and closing arguments. *See, e.g., United States v. De Peri,* 778 F.2d 963, 979 (3d Cir.1985); *United States v. Garvin,* 88 Fed.Appx. 542, 544 (3d Cir.2004) (nonprecedential). Here, the information contained in the chart was supported by the evidence, and the Court appropriately exercised its discretion in allowing the Government to use the chart. Accordingly, Mr. Hilles' decision not to object to the chart was not in error.

\* \* \*

Overall, Petitioner has failed to show a sufficient quantum of cumulative trial errors—if he has shown any—that amount to a critical mass that "can no longer be determined to be harmless." *Albrecht v. Horn,* 485 F.3d 103, 139 (3d Cir.2007) (citation and internal quotation marks omitted). Moreover, Petitioner is "not entitled to relief based on cumulative errors unless he can establish 'actual prejudice,'" and he has utterly failed to show prejudice for these supposed errors. *Id.* (quoting *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)). Accordingly, Petitioner's claim of cumulative error must fail.

### E. *Ground 5: Failure to Object to the Government's Statements*

Petitioner next argues that a number of the Government's statements were im-

proper in several respects and that Mr. Hilles' failure to object constitutes ineffectiveness. Pet'r's Br. 86. Specifically, Petitioner asserts that counsel for the Government (1) vouched for its witnesses, (2) misstated the record, (3) attacked defense counsel, and (4) "[a]rtificially bolstered the Government's case by referencing the social benefits of the conspiracy statute." *Id.* The Court will take each claim in turn.

### 1. *Vouching for Witnesses*

 The Third Circuit has established that "[v]ouching occurs when two criteria are met: '(1) the prosecutor must assure the jury that testimony of a Government witness is credible; and (2) this assurance is based on either the prosecutor's personal knowledge, or other information not contained in the record.'" *United States v. Lee,* 612 F.3d 170, 195 (3d Cir.2010) (quoting *United States v. Walker,* 155 F.3d 180, 187 (3d Cir.1998)). Despite Petitioner's claims to the contrary, these factors are simply not present here.

Petitioner avers that vouching occurred [9] in the Government's closing argument when the prosecutor stated the following: "I submit to you that if the co-conspirators just made up stories about these four people being in this conspiracy, then why are there certain little things that happen[ed] during this trial? ... They're telling you the truth about what happened." Trial Tr. 98–99, May 28, 2009. On their face, however, these comments are not inappropriate—as is made even more obvious when they are placed in their proper context.

To determine whether vouching occurred here, the Court will consider the Government's argument in its entirety. After discussing the Government's evidence at length, including the testimony of the cooperating witnesses and other corroborating evidence, Government's counsel stated the following:

I submit to you that if the co-conspirators just made up stories about these four people being in this conspiracy, then why are there certain little things that happen[ed] during this trial? Why does Darryle Dunbar testify that he knows Twan is a source, that he knows 5235 Rhinehart, and he knew no other source? And then, when Steven Bernard took the stand, he was asked on cross-examination, well, didn't you take Darryle Dunbar to see Robert Williams, and Bernard said, no. No, we never went to see Williams when I was with Darryle Dunbar.

They're telling you the truth about what happened. Why did Mike Martin know 4508 Old York Road and the Korman Suite only, unless he's telling you what happened when he drove from Maryland to Philadelphia? And see if they can explain to you some of this hard evidence that we've looked at this morning.

Why is Kareem Smith on the phone with Robert Williams and Antoine Alicea at the exact same times that the cocaine is being obtained that he's then cooking, and it's getting seized by law enforcement. And why do those phone records

---

**9.** Petitioner also claims that the prosecutor improperly "attested to the honesty of her argument," Pet'r's Br. 87, when she stated, "[s]o, I have been straight with you." Trial Tr. 58, May 29, 2009. However, Petitioner misreads the record, which makes it clear that, rather than attesting to her own honesty, the prosecutor was responding to and repeating a portion of Mr. Narcisi's argument. Thus, in context, she stated the following:

Mr. Narcisi came up and he is a very good speaker, and he said I have been very straight with you ladies and gentlemen, I conceded that Mr. Williams made that delivery of the sixty-two grams of cocaine. So, I have been straight with you. Then, he proceeds to spend the rest of his closing talking out both sides of his mouth.

*Id.* Contrary to Petitioner's claim, these comments were proper.

look so much like the one where Kareem Smith is talking to James Robinson, and James Robinson then tells you, yeah, I was delivering, I was delivering this many ounces of crack—or cocaine which was supposed to go to Kareem Smith except I got stopped by the police.

If Jamal Turnquest, ladies and gentlemen, is nothing more than a flunky, then see if they can adequately explain to you why he's always there? When the Maryland Police finally got close enough to start arresting Kareem Smith, where they started finding their target, why was it that Jamal Turnquest was always standing there right next to him, and damn, if he didn't have the coke right there in his pocket. Why is his fingerprint on the plate that they were using to bag it up, if all he is is just the little guy that tags along? See if they can explain those things to you.

We've had two and a half weeks of hard evidence in this case. . . .

*Id.* at 98–100.

These statements, taken as a whole, reveal that Government's counsel was not personally vouching for said witnesses, but was pointing out to the jury that their reliability was supported by physical evidence seized by police, phone records, observations made by police, as well as other evidence presented over the course of the two-and-a-half-week trial. Government's counsel never made assurances based on her personal knowledge—rather, she simply argued for her view of what the evidence showed. These statements did not constitute improper vouching by the Government, and Mr. Hilles was not ineffective for failing to make a baseless objection to them.

Petitioner also asserts that the following comment made during the Government's opening statement was inappropriate: "Well, they also have a tremendous incentive to tell the truth because, for them to think that they're going to get over on the Government and lie and get away with it, is ridiculous." Trial Tr. 81, May 12, 2009. To support his argument, Petitioner relies on *United States v. Dispoz-O-Plastics, Inc.,* 172 F.3d 275 (3d Cir.1999), in which the Third Circuit found that it was improper for a prosecutor to comment in his closing rebuttal argument that he could personally "guarantee" that "the Justice Department. doesn't give two for one deals." *Id.* at 280. The court reasoned that because the prosecutor's comment was not based on any evidence in the record and the comment left the jury to infer that "other information existed, which the government used to verify the credibility of its witnesses." *Id.* at 284 (quoting *United States v. DiLoreto,* 888 F.2d 996, 998 (3d Cir.1989)) (internal quotation marks omitted). But that did not occur here.

Here, the statement was made during Government counsel's discussion about the evidence that would be offered at trial. Before making the comment, the prosecutor spoke at length about the cooperating witnesses who would testify. *See* Trial Tr. 79–81, May 12, 2009. The prosecutor discussed their involvement in the charged crimes, the fact that they would be testifying pursuant to guilty plea agreements, and their obligations under the guilty plea agreements—including their obligation to tell the truth, the ramifications of failing to tell the truth or otherwise violating their guilty plea agreements, the possible benefit they might receive for their cooperation, and evidence that would corroborate their testimony. *Id.*

Importantly, the prosecutor never referred to any extraneous Department of Justice policy or other extrinsic evidence, nor did the prosecutor make any "guarantee[s]". *See Dispoz-O-Plastics,* 172 F.3d at 280. Rather, the prosecutor properly

observed that the cooperating witnesses were strictly bound by agreements with the Government to tell the truth, and that violation of those agreements would result in severe consequences. When the cooperating witnesses testified at trial, the Government elicited testimony about their guilty plea agreements, including, in some instances, the witnesses' obligation to tell the truth. *See* Trial Tr. 76–77, May 14, 2009; 132–33, May 15, 2009; 199–200, May 18, 2009; 60–61, 131–32, May 19, 2013; 135, May 20, 2009; 215–16, May 21, 2009; 11, May 22, 2009; 143–44, May 26, 2009.

Unlike in *Dispoz–O–Plastics,* the record here is awash with evidence that supported the prosecutor's opening remarks about how the cooperating witnesses were bound to tell the truth under their plea agreements. The Government's statement did not refer to any evidence that was not introduced at trial and, contrary to Petitioner's claim, it did not "suggest[ ] some extrinsic policy or procedure by the Department of Justice to which the jury did not have access." Pet'r's Br. 87. Once again, there was nothing improper about the prosecutor's comments, and therefore Mr. Hilles' decision not·to object did not render his performance deficient.

### 2. *Misstating the Record*

■ Next, Petitioner complains that the prosecutor misrepresented evidence in her closing argument regarding the movement of a gun among the coconspirators. The prosecutor's statement reads as follows:

> Ladies and gentlemen, what better evidence of these men working together to conduct a long-term cocaine business do you need than this? Alicea wanted a gun. He told Kareem Smith. Kareem Smith told David Spratt. Spratt gets the gun. Smith brings the gun to Alicea, who gives him the cocaine powder. Is this some arm's length buyer/seller relationship between these two individuals? Of course not. Alicea is in for a penny and in for a pound.

Trial Tr. 95, May 28, 2009. Thus, the prosecutor argued that this is was good evidence of a conspiracy. Although Petitioner objects on the ground that "[n]o witness testified that Kareem Smith told David Spratt that Petitioner Alicea wanted a gun," Pet'r's Br. 88, the prosecutor simply drew logical inferences supported by the testimony of four separate witnesses who provided testimony concerning said gun. There is nothing improper about this. Also, the Court in its final charge instructed the jury that even though an attorney may have called attention to certain facts, the lawyers' comments were not evidence, and it was the jury's own recollection that controls. Trial Tr. 74, May 29, 2009. Accordingly, Mr. Hilles was not remiss for not objecting to the prosecutor's comments.

### 3. *Attacking Defense Counsel*

■ Petitioner next argues that the Government improperly attacked defense counsel by stating that Mr. Caglia insulted the Government, by referring to one of Mr. Narcisi's arguments as "inappropriate," and by quipping that Smith did not have the benefit of careful accounting by "Lawrence Narcisi, CPA." Pet'r's Br. 89; Trial Tr. 52, 55, 59, May 29, 2009. But each of the Government's comments were made in response to comments made by defense counsel in their closing arguments, and "[t]he invited response doctrine protects comments made in reasonable response to improper attacks by defense counsel." *United States v. Wood,* 486 F.3d 781, 788 (3d Cir.2007) (quoting *United States v. Walker,* 155 F.3d 180, 186 n. 5 (3d Cir.1998)) (internal quotation marks omitted). The doctrine's rationale is that any "unfair prejudice flowing from the two arguments may balance each other out, thus obviating the need for a new trial." *Walk-*

*er*, 155 F.3d at 186 n. 5 (quoting *United States v. Pungitore*, 910 F.2d 1084, 1126 (3d Cir.1990)) (internal quotation marks omitted). A prosecutor may use the doctrine defensively, but not "as a springboard for the launching of affirmative attacks upon … defendants." *Id.*

In his closing argument, defense attorney Caglia claimed that the Government coached a witness on a break during that witness's trial testimony, even though that witness denied being coached when asked by Mr. Caglia on cross-examination. *See* Trial Tr. 52, May 29, 2009. Understandably, the prosecutor argued that this was insulting to the Government. *Id.* The prosecutor then commented on Mr. Narcisi's taking issue with Smith's computations of drug profits, and she quipped that the organization did not have the help of "Laurence Narcisi, CPA" doing accounting work for their drug business. *Id.* at 55. Finally, the prosecutor also responded to Mr. Narcisi's comment to the jury that the Government brought in "fifty witnesses to numb your senses," *id.* at 60, and she asserted that it was "an incorrect argument" and "not appropriate." *Id.* at 59. Once again, this was a fair response to defense counsel's inflammatory comments. Accordingly, Mr. Hilles cannot be faulted for failing to object to the prosecutor's proper statements.

When viewed in context, the challenged statements were brief and limited in scope, were related to the evidence presented at trial, and were fair responses to arguments made by defense counsel in their closing arguments. Even so, the district court properly instructed the jury that the statements of counsel were not evidence, *see* Trial Tr. 4–5, May 12, 2009; Trial Tr. 71–74, May 29, 2009, thus eliminating any prejudicial effect of the prosecutor's comments. *See United States v. Retos*, 25 F.3d 1220, 1224 (3d Cir.1994) ("Even if a prosecutor does make an offending state-

ment, the district court can neutralize any prejudicial effect by carefully instructing the jury to treat the arguments of counsel as devoid of evidentiary content." (internal quotation marks omitted)). Thus, even assuming, arguendo, that the prosecutor's statements were at all untoward, the instructions cured any potential prejudice.

#### 4. Referencing the Social Benefits of Conspiracy Law

■ Petitioner also claims that the Government improperly bolstered its case by referring to "the social benefits of the federal conspiracy law." Pet'r's Br. 90. But he cites no authority in support of his argument and instead merely claims that it was a "clear invitation to convict." *Id.* Again, Petitioner takes the prosecutor's statement out of context. The prosecutor was commenting on the testimony of a Philadelphia Police Officer who testified about how the police could arrest someone inside a drug house and "ten minutes later the organization is back up and running." Trial Tr. 66, May 29, 2009. The prosecutor gave several examples of how members of this organization were arrested selling drugs inside homes that the organization controlled, and how other members stepped in and picked up where those arrested had left off. *Id.* at 65–67. She also explained how it takes agents years to piece together these types of cases, and stressed the importance of the federal drug conspiracy laws in helping the agents do their jobs to curb this activity. *Id.* Simply put, there is nothing improper with this argument. It was based on the evidence presented during trial, it described how the investigation unfolded, and it explained the law which enabled the Government to bring an end to this organization's reign. Thus, Mr. Hilles did not err in not objecting to these statements.

\* \* \*

Again, Petitioner has not shown any trial errors to which Mr. Hilles failed to object-much less cumulative trial errors amounting to prejudicial harm. *See Albrecht,* 485 F.3d at 139. Therefore, Petitioner's claims as to the Government's closing remarks must fail.

### F. *Ground 6: Failure to Object to Jury Instruction*

Petitioner next claims that Mr. Hilles was ineffective for failing to object to the Court's instruction concerning the buyer/seller relationship. Pet'r's Br. 92. Petitioner argues that the following instruction incorrectly stated the law:

> In considering whether a conspiracy or a buyer/seller relationship existed, you should consider all of the evidence including the following factors. Whether the transaction involved large quantities of a controlled substance. Whether the parties had a standardized way of doing business over time. Whether the sales were on credit or consignment. Whether the parties had a continuing relationship. Whether the seller had a financial stake in the resale of the buyer, and whether the parties had an understanding that the controlled substance would be resold. No single factor necessarily indicates by itself that a defendant was or was not engaged in a buyer/seller relationship.

Trial Tr. 109, May 29, 2009. Petitioner's position is incorrect, as the Court's instructions fully and properly addressed the applicable law of conspiracy as well as the buyer/seller relationship, and Mr. Hilles was not ineffective for failing to object to a proper jury instruction.

In *United States v. Gibbs,* 190 F.3d 188 (3rd Cir.1999), the Third Circuit identified a number of factors that courts may consider in determining whether a defendant is a member of a conspiracy: "the length of affiliation between the defendant and the conspiracy; whether there is an established method of payment; the extent to which transactions are standardized; ... whether there is a demonstrated level of mutual trust; ... whether the buyer's transactions involved a large amount of drugs[;] ... [and w]hether the buyer purchased his drugs on credit." *Gibbs,* 190 F.3d at 199 (citations omitted). These factors are not mandatory, nor are they "necessarily dispositive of the issue," *id.,* but they are among the many things that juries may consider in determining whether a particular defendant is guilty of drug conspiracy. "[T]he presence of one or more of these factors furthers the inference that the buyer knew that he was part of a larger operation and hence can be held responsible as a co-conspirator." *Id.* at 200.

Petitioner asserts that the Court improperly excluded two of the factors from the instructions: (1) "if there was an established method of payment," and (2) "whether there was a demonstrated level of mutual trust." Pet'r's Br. 91.[10] But the Court did not err in its instructions-particularly given the fact that the *Gibbs* factors are neither mandatory nor exclusive. *See Gibbs,* 190 F.3d at 199 (using permissive phrases such as "[a]mong the factors courts *have* considered" and "*may* also be relevant" (emphasis added)).

The Court's instructions correctly stated the law of conspiracy. The Court advised

---

**10.** Even if the Court did not use the precise language of the two factors cited by Petitioner, the determination of "[w]hether the parties had a standardized way of doing business over time" arguably encompasses an inquiry into whether "there was an established method of payment," and the determination of "[w]hether the parties had a continuing relationship" may well involve questioning "whether there was a demonstrated level of mutual trust." *See* Pet'r's Br. 91.

the jury that it must find both that the conspiracy existed and that each defendant knew the purpose of the agreement and deliberately joined it with the intent to further its purpose. Trial Tr. 95–103, May 29, 2009. The Court further explained that mere association with others and discussion of common goals, or similarity of conduct, or knowing about criminal conduct, does not make someone a member of a conspiracy, nor does a person's doing something that inadvertently advances the conspiracy. *Id.* at 101.

Petitioner's quibbling about the precise language of the *Gibbs* factors does not avail him, particularly given the fact that a "trial judge retains discretion to determine the language of the jury charge.... So long as the court conveys the required meaning, the particular words used are irrelevant." *United States v. Flores,* 454 F.3d 149, 161 (3d Cir.2006). And because the charge was proper, Mr. Hilles' performance cannot be found to be deficient for his failure to object.

### G. *Ground 7: Ineffectiveness at Bifurcated Sentencing Hearing*

■ Petitioner next argues that Mr. Hilles' representation at his bifurcated sentencing hearing was ineffective. As with his claim regarding his direct appeal, Petitioner argues that the methodology used by the Court in its quantity attribution analysis was flawed in that the Court failed to conduct a "searching and individualized inquiry." Pet'r's Br. 93. Petitioner further asserts that there was "no legal or factual support" for the Court's decision to hold him responsible for cocaine supplied by other coconspirators, or for the Court's conclusion that he was involved in the conspiracy from the beginning to the end. *Id.* at 94–95. Finally, Petitioner again contends that the Court's determination of the quantity of cocaine distributed during the life of the conspiracy "was anything but conservative." *Id.* at 96. Accordingly, Pe-

titioner blames all of this on Mr. Hilles' failure to present evidence and proper legal argument at the hearings. *Id.* at 93.

To begin with, Petitioner fails to recognize that the Third Circuit has already approved every aspect of the Court's quantity attribution analysis. The Court of Appeals affirmed the Court's determinations of the length of time Petitioner was involved in the conspiracy, the quantity of cocaine that Petitioner was held accountable for, and the Petitioner's accountability—on account of the reasonable foreseeability to Petitioner—for the quantities of cocaine distributed by other suppliers to the organization. *See United States v. Alicea,* 496 Fed.Appx. 192, 196 (3d Cir. 2012). To the extent that Petitioner's claim suggests that the Court erred in its analysis at sentencing, his claim must fail.

Moreover, an examination of Hilles' performance demonstrates that he was diligent in his efforts to undermine the Government's evidence. At the post-trial motion hearing Mr. Hilles again challenged the evidence presented at trial and continued to argue that Petitioner was only engaged in a buyer/seller relationship with Smith. Mot. Hr'g Tr. 4–9, March 5, 2010, ECF No. 851. At the bifurcated sentencing hearing, Mr. Hilles reiterated his argument concerning the buyer/seller relationship and also challenged the methodology employed by the Court in arriving at the amount of cocaine attributable to Petitioner. Hr'g Tr. 17–27, June 28, 2010, ECF No. 842. Mr. Hilles argued that Petitioner should only be held accountable for the quantity found by the jury, that is, 5 kilograms of cocaine and 50 grams of crack. *Id.* at 21–22. He further argued that the trial testimony concerning quantity and length of time in the conspiracy was uncertain, unreliable, and contradictory. *Id.* at 20–21. At sentencing, in support of his argument for a

downward variance, Mr. Hilles reasserted his arguments that the trial evidence was unreliable and did not support a finding that Petitioner knew what the other coconspirators were doing and that his role was much less significant than those of his coconspirators. Sent. Hr'g Tr. 27–29, August 19, 2010, ECF No. 840. The record shows that throughout the process, Mr. Hilles put forth persistent effort on behalf of his client to minimize the impact of his conviction at sentencing.

As mentioned previously, the Third Circuit has found that the Court's sentence in this case was supported by the evidence and was arrived at using the appropriate legal standard. Contrary to Petitioner's claim, Mr. Hilles cannot be found ineffective for failing to object when Petitioner's sentence was properly determined and sufficiently supported.

### H. *Ground 8: Ineffectiveness at Appellate Stage*

Finally, Petitioner claims that Mr. Hilles was ineffective at the appellate stage because he failed to raise several of the grounds previously addressed in this opinion. Pet'r's Br. 98. But each one of those claims clearly lacks merit-and failure to raise an unmeritorious claim on appeal does not amount to ineffectiveness. *See United States v. Turner*, 677 F.3d 570, 576–77 (3d Cir.2012).

In his argument, Petitioner refers to the fact that his coconspirator's case was remanded for resentencing because the Third Circuit determined that Malik Bland was held accountable for a quantity of cocaine during a period for which the Government failed to show that he was involved in the conspiracy—specifically, a period when Bland was incarcerated. Pet'r's Br. 98–99; *see United States v. Bland*, 502 Fed.Appx. 143, 146–47 (3d Cir. 2012). Although he was never incarcerated during the relevant period of the con-

spiracy, Petitioner believes that somehow the *Bland* decision shows that his appellate counsel should have raised the same argument. But Petitioner is incorrect, and—apart from his conclusory allegations—he has pointed to no evidence that undermines the Court's factual determination that he participated throughout the life the conspiracy. As recognized by the Court of Appeals, "Smith's trial testimony supported th[e] determination" that Petitioner "was a member of the SCCG from its beginning (November 2002) to its end (September 2007), and thus, he was involved for 58 months, which conservatively equates to 232 weeks." *Alicea*, 496 Fed. Appx. at 196. Once more, Petitioner has failed to show trial error, deficient representation, or prejudice.

### IV. CERTIFICATE OF APPEALABILITY

▆▆▆▆ When a court issues a final order denying a § 2255 petition, it must also decide whether to issue a certificate of appealability. Such a certificate "may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Pabon v. Mahanoy*, 654 F.3d 385, 393 (3d Cir.2011) (quoting *Miller–El v. Cockrell*, 537 U.S. 322, 327, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003)). Here, Petitioner has made no such showing for any of the claims raised in his petition. The Court therefore declines to issue a certificate of appealability.

### V. CONCLUSION

For the foregoing reasons, the Court will deny Petitioner's § 2255 petition to

vacate, set aside, or correct his sentence. An appropriate order follows.

### *ORDER*

**AND NOW,** this 23rd day of April, 2015, for the reasons stated in the accompanying memorandum, it is hereby **ORDERED** that Petitioner's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence (ECF Nos. 952, 957) is **DENIED.**

**AND IT IS SO ORDERED.**